CHARLES J. OLSON, APPELLEE, v. WALTER J. LAMB ET AL. APPELLANTS.

FILED SEPTEMBER 23, 1898. No. 8019.

1. **Judicial Sales: PURCHASE BY ATTORNEY: TRUSTS.** An attorney may not purchase at judicial sale property in which his client is interested. If he do so the client at his election may treat him as a trustee.

2. ———: ———: ———: RATIFICATION. But the client by afterwards dealing with the attorney as the owner, may ratify the purchase or estop himself from claiming the benefit thereof.

3. ———: ———: ———. If the attorney conceal from the client material facts which might affect the client's election, dealings with the attorney on the basis of the latter's ownership, but in ignorance of such facts, will not prevent the client, on learning the facts, from then enforcing the trust.

4. ———: **CONTRACT RELATING TO BIDS.** A contract between two persons, whereby one of them is to bid at a judicial sale, with provisions for subsequently handling the property on behalf of both, will be upheld, when the intent or effect was not to chill bids or prevent competition, but to permit a bid to be made on behalf of both where neither could bid alone.

5. **Attorney and Client: JUDGMENT.** An attorney who purchases a

Olson v. Lamb.

judgment against his client may recover thereon only the amount he paid and not the face of the judgment.

6. **Constructive Trustee:** FRAUD: ACCOUNTING. While a constructive trustee, for actual fraud, may be denied reimbursement, this rule will not be extended to a case where the circumstances raising the trust were not directly the result of the fraud. If there was fraud in collateral matters this may be compensated in the accounting.

7. **Contracts:** FRAUD: RESCISSION. A contract rescinded for fraud is rescinded *in toto*, and an adjustment of matters growing therefrom must proceed on both sides independent of the contract.

8. **Constructive Trustee:** COMPENSATION. A constructive trustee who is charged with rents should be credited with his reasonable expenditures, and may be allowed a reasonable compensation for managing the property.

9. **Attorney:** TRUSTS: COMPENSATION. An attorney who purchases for his own benefit will not, in a suit to declare a trust, be allowed compensation for professional services in procuring the sale to be confirmed.

10. **Set-Off:** PARTNERSHIP. A claim owing to a firm of which the defendant was a member cannot be set off against debts owing by the defendant individually.

11. **Att'rney and Client:** JUDICIAL SALES: ACCOUNTING. An attorney owned in his own right one of several liens upon property under foreclosure. A sale was had and to procure a re-sale he offered to bid a certain sum. On the re-sale he bought for $1,000 less than his offer. To procure confirmation he remitted $1,000 from his own lien. One of his clients held a lien of equal priority, and the bid actually made was insufficient to pay this class. *Held*, That on an accounting the client was entitled to such share of the $1,000 as he would have realized if the bid had been that much higher and no remittitur entered.

APPEAL from the district court of Lancaster county. Heard below before TIBBETS, J. *Reversed.*

The opinion contains a statement of the case.

*Ricketts & Wilson*, for plaintiff and the Prentice Brownstone Company:

The set-off was erroneously allowed. (*Dorsey v. McGee*, 30 Neb. 657; 22 Am. & Eng. Ency. Law 287, notes 1, 3; 2 Bates, Partnership secs. 1078, 1084; *Dehon v. Stetson*, 9 Met. [Mass.] 341.)

Where an agent is unfaithful to his trust, or abuses the confidence reposed in him, or engages in transactions by which he acquires interests adverse to those of his principal, or otherwise misconducts himself in the business of his agency, he should be deprived of commissions and compensation. (1 Am. & Eng. Ency. Law 397; *Larey v. Baker*, 12 S. E. Rep. [Ga.] 684; *Chatfield v. Simonson*, 92 N. Y. 209; *Andrews v. Tyng*, 94 N. Y. 16; *Hofflin v. Moss*, 67 Fed. Rep. 440; *Cleveland & St. L. R. Co. v. Pattison*, 15 Ind. 70; *Porter v. Silvers*, 35 Ind. 295; *Vennum v. Gregory*, 21 Ia. 326; *Sumner v. Reichenikcr*, 9 Kan. 320; *Pollard v. Lathrop*, 20 Pac. Rep. [Colo.] 171; *Barnes v. Mays*, 16 S. E. Rep. [Ga.] 67.)

Where an attorney buys for himself property in relation to which he has been intrusted with regarding the interests of his client, the court should compel the purchaser to act as trustee and not as owner. Where an attorney makes a purchase secretly and does not disclose that he is purchaser, the purchase is voidable at the option of the client. The defendant claiming title through the judicial sale should be required to convey the premises to his client and to account to the latter for the rents and profits. (*Baker v. Humphrey*, 101 U. S. 494; *Johnson v. Outlaw*, 56 Miss. 546; *Briggs v. Hodgdon*, 7 Atl. Rep. [Me.] 388; *Moore v. Brocken*, 27 Ill. 23; *Pearce v. Gamble*, 72 Ala. 341; *Sutherland v. Reeve*, 41 Ill. App. 302; *Wheeler v. Willard*, 44 Vt. 645; *Barrett v. Bamber*, 9 Phila. 202; *Wright v. Walker*, 30 Ark. 48; *McPherson v. Watt*, L. R. 3 App. Cas. [Eng.] 254; *Davis v. Smith*, 43 Vt. 269; *Harper v. Perry*, 28 Ia. 60; *Stockton v. Ford*, 11 How. [U. S.] 232; *Wade v. Pettibone*, 11 O. 60; *Ingalls v. Rowell*, 36 N. E. Rep. [Ill.] 1018; *Wilson v. Kellogg*, 77 Ill. 47; *Loyd v. Malone*, 23 Ill. 43; *Manhattan Cloak & Suit Co. v. Dodge*, 21 N. E. Rep. [Ind.] 344; *Crayton v. Spullock*, 13 S. E. Rep. [Ga.] 561; *Phelps v. Benson*, 29 Atl. Rep. [Pa.] 86; *Hatch v. Fogerty*, 40 How. [N. Y.] 492; *Cunningham v. Jones*, 15 Pac. Rep. [Kan.] 572; *Zeigler v. Hughes*, 55 Ill. 288; *West v. Raymond*, 21 Ind. 305; *Simp-*

*son v. Lamb*, 7 Ell. & Bl. [Eng.] 90; *Baker v. Humphrey*, 101 U. S. 494; *Eoff v. Irvine*, 18 S. W. Rep. [Mo.] 907; *Davis v. Kline*, 9 S. W. Rep. [Mo.] 724; *Succession of Hoss*, 8 So. Rep. [La.] 833; *Larcy v. Baker*, 12 S. E. Rep. [Ga.] 684.)

Where actual fraud is shown the court should refuse its aid to remedy the condition of the wrongdoer. (*Walton Plow Co. v. Campbell*, 35 Neb. 173; *Gilbert v. Hoffman*, 26 Am. Dec. [Pa.] 105; *Guckenheimer v. Angerine*, 81 N. Y. 397; *Burnham v. Heselton*, 20 Atl. Rep. [Me.] 80; *Connecticut Mutual Life Ins. Co. v. Smith*, 117 Mo. 261; *Sands v. Codwise*, 4 Johns. [N. Y.] 599; *McCasky v. Graff*, 62 Am. Dec. [Pa.] 336; *Goble v. O'Connor*, 43 Neb. 49.)

Any combination or arrangement between intending bidders which tends to prevent competitive bidding, renders the sale to one of such colluding bidders fraudulent and void. (*Devine v. Harkness*, 117 Ill. 45; *Crumb v. Davis*, 54 Ia. 25; *Brisbane v. Adams*, 3 N. Y. 129; *Carrothers v. Harris*, 23 W. Va. 177; *Cain v. Cox*, 23 W. Va. 594; *Gardiner v. Morse*, 25 Me. 140; *Durfee v. Moran*, 57 Mo. 374; *Wooton v. Hinkle*, 20 Mo. 290; *Hook v. Turner*, 22 Mo. 333; *Abbey v. Dewey*, 25 Pa. St. 413; *Hamilton v. Hamilton*, 2 Rich. Eq. [S. Car.] 355; *Jackson v. Ludeling*, 21 Wall. [U. S.] 616; *Jones v. Caswell*, 3 Johns. Cas. [N. Y.] 29; *Benedict v. Gilman*, 4 Paige Ch. [N. Y.] 58; *Brown v. Lynch*, 1 Paige Ch. [N. Y.] 147; *Easton v. Mawkinney*, 37 Ia. 601; *Martin v. Evans*, 2 Rich. Eq. [S. Car.] 368; *Weld v. Lancaster*, 56 Me. 453; *Fleming v. Hutchinson*, 36 Ia. 519; *Underwood v. McVeigh*, 23 Grat. [Va.] 409.)

The agreement of a bidder to pay the judgment of another in consideration of the latter not bidding is fraudulent. (*Slingluff v. Eckel*, 24 Pa. St. 472; *Barton v. Benson*, 126 Pa. St. 431.)

*Lamb, Adams & Scott, contra:*

Neither plaintiff nor cross-petitioner could have recovered the property, and there is no equity in their case. (*Burke v. Daly*, 14 Mo. App. 542; *Page v. Stubbs*, 39

Ia. 537; *Wilber v. Robinson,* 29 Mo. App. 165; *Johnson v. Outlaw,* 56 Miss. 541; *Marsh v. Whitmore,* 21 Wall. [U. S.] 178; *Kisling v. Shaw,* 33 Cal. 425.)

Plaintiff and cross-petitioner are estopped from setting up any claim to the property. (*Gillespie v. Sawyer,* 15 Neb. 536; *Wilcox v. Raben,* 24 Neb. 372; *Forbes v. McCoy,* 24 Neb. 706; *Malley v. Thalheimer,* 44 Conn. 41.)

Neither upon the pleadings nor by the defendant's conceding to the cross-petitioner the right to redeem, which it did not have, does the plaintiff or the cross-petitioner obtain anything but the naked legal right. (*Foley v. Holtry,* 41 Neb. 563; *McCulloch v. Scott,* 13 B. Mon. [Ky.] 172; *Johnson-Brinkman Commission Co. v. Missouri P. R. Co.,* 52 Mo. App. 407; *Wynkoop v. Niagara Fire Ins. Co.,* 91 N. Y. 478; *Beals v. Home Ins. Co.,* 36 N. Y. 522; *Platt v. Ætna Ins. Co.,* 38 N. E. Rep. [Ill.] 538; *Rob v. Vose,* 15 Sup. Ct. Rep. 14; *Connihan v. Thompson,* 111 Mass. 272.)

Parties are bound to the particular form of action which they first adopt. (*Barndt v. Frederick,* 47 N. W. Rep. [Wis.] 6; *Warren v. Landry,* 42 N. W. Rep. [Wis.] 247; *O'Rourke v. Leva,* 13 So. Rep. [Ala.] 747; *Thomas v. Coultas,* 76 Ill. 494; *Rodermund v. Clark,* 46 N. Y. 354; *Stevens v. Hyde,* 32 Barb. [N. Y.] 171; *Kinney v. Kiernan,* 49 N. Y. 164.)

The election to redeem the property by the Prentice Brownstone Company, and the acceptance thereof by the defendant, constitute a binding contract, from which said cross-petitioner cannot retire except by the consent of these defendants. (*Downey v. Gerrard,* 3 Grant's Cas. [Pa.] 64; *Beardsley v. Root,* 11 Johns. [N. Y.] 464; *Finlay v. Bryson,* 84 Mo. 671; *Vassault v. Edwards,* 43 Cal. 465; *Estes v. Furlong,* 59 Ill. 302; *Tobey v. Foreman,* 79 Ill. 489; *Favill v. Roberts,* 50 N. Y. 222; *Goodman v. Winter,* 64 Ala. 410; *Sowle v. Holdridge,* 25 Ind. 119.)

Defendants are entitled to a decree against the plaintiff dismissing the bill, and against the cross-petitioner, the Prentice Brownstone Company, for the value of the

improvements placed upon the property, not only for the amount expended, but for the amount that the improvements have increased the value of the property over what it was at the date of the sale. (*Chaney v. Coleman*, 13 S. W. Rep. [Tex.] 850; *McMurray v. Day*, 70 Ia. 671; *Smith v. Drake*, 23 N. J. Eq. 302; *Freichnecht v. Meyer*, 39 N. J. Eq. 551; *Hammond v. Inloes*, 4 Md. 138; *Bacon v. Cottrell*, 13 Minn. 184; *Mulford v. Minch*, 3 Stock. [N. J.] 17; *Smith v. Townshend*, 27 Md. 369; *McLaughlin v. Barnum*, 31 Md. 425; *Oliver v. Court*, 8 Pr. [Eng.] 172; *Ex parte Hughes*, 6 Ves. [Eng.] 617.)

Defendants are entitled to be reimbursed for all expenses paid or incurred and for all services rendered while in possession of the property. (*Edwards v. Gottschalk*, 25 Mo. App. 549; *Iddings v. Bruen*, 4 Sandf. Ch. [N. Y.] 223.)

Defendant is entitled to recover commissions for all moneys collected or paid out, and for all business done about the property while trustee. (*Jennison v. Hapgood*, 10 Pick. [Mass.] 111; *Shirley v. Shattuck*, 6 Cush. [Miss.] 13; *Miller v. Beverleys*, 4 H. & M. [Va.] 415; *Barrel v. Joy*, 16 Mass. 227; *Cowing v. Howard*, 46 Barb. [N. Y.] 579; *Barney v. Saunders*, 16 How. [U. S.] 542; *Brown v. South Boston Savings Bank*, 148 Mass. 300; *Rensselaer & S. R. Co. v. Miller*, 47 Vt. 152; *Tucker v. Buffum*, 16 Pick. [Mass.] 46; *Waterman v. Curtis*, 26 Conn. 247.)

The purchase by Muir and the conveyance by him to defendants do not change the rights of the parties. (*Beeson v. Beeson*, 9 Pa. St. 279.)

IRVINE, C.

This action was brought by Charles J. Olson against Walter J. Lamb and his wife, for the purpose of having a trust declared in favor of plaintiff in certain property alleged to have been bought by Lamb at judicial sale while he was acting as attorney for plaintiff. The Prentice Brownstone Company was made a party defendant, and by cross-petition alleged that Lamb was also its at-

torney in the foreclosure case resulting in the judicial
sale, and it prayed that a trust be declared and convey-
ance ordered. Both the petition and cross-petition origi-
nally offered as a condition of the conveyance to reim-
burse Lamb for his expenses. After the coming in of
an answer in which Lamb, among other things, pleaded
the agreement under which the sale was made, herein-
after more particularly referred to, the plaintiff and the
cross-petitioner amended their respective pleadings,
withdrawing their offer to redeem and demanding a con-
veyance without submitting to redemption. From the
decree rendered appeals were taken by all parties. The
appeal of Lamb raises, among other things, the question
of the propriety of permitting the case to proceed on the
amended petitions. The district court had, however, by
its decree, required Olson to redeem, and had denied to
the Prentice Brownstone Company any relief whatever,
so that we cannot see how the propriety of the amend-
ment becomes a material consideration.

Preliminary to the consideration of the merits of the
case a statement of the somewhat complicated facts in-
volved becomes necessary. In this statement we shall
endeavor to omit, for the sake of brevity and clearness,
non-essentials and the less important details. Their
omission from the statement, however, is no indication
that they have been overlooked in considering the case.
In 1892 Mr. Howell was the owner of a certain lot in the
city of Lincoln, and undertook the construction thereon
of a building described in the record as the "Conserva-
tory of Music." He made a contract with Olson for the
stone and brick work on the building, and Olson began
the performance of the work, purchasing material from
several different persons to whom he became indebted
therefor. After the work had progressed to a consider-
able extent, but before the building was under roof, it
became evident that Howell was unable to proceed, and
the decree on sufficient evidence finds that he was wholly
insolvent. Mr. Lamb was then a member of the law firm

of Lamb, Ricketts & Wilson, and Mr. Olson consulted
him with reference to his interests. Mr. Olson intro-
duced to Mr. Lamb the agent of the Prentice Brownstone
Company, to which Olson was indebted for stone fur-
nished for the erection of the building. Mechanics' liens
were perfected both by Olson and the stone company,
and a suit to foreclose the liens was begun by the stone
company. About this time the firm of Lamb, Ricketts &
Wilson was dissolved. The evidence indicates that busi-
ness intrusted to it before the dissolution was carried
on by one or another of the members of the late firm on
behalf of the old firm. The business of Olson and the
stone company was in part conducted by Mr. Wilson, but
the evidence amply sustains the finding that Mr. Lamb
remained the attorney of both parties until after the sale
in controversy. There was on the property, at the time
the liens accrued, a mortgage to the Nebraska Savings
Bank of about $6,000. For the purpose of enabling How-
ell to obtain a further loan Olson had consented that an-
other mortgage be made which should have priority over
any lien of his, and consequently the Savings Bank had
made another mortgage loan of about $2,500. The ma-
terial-men we have here to consider had not, however,
waived their rights. Consequently when the decree was
rendered in the foreclosure case it established the origi-
nal mortgage as a first lien, a certain judgment which does
not figure in the case as a second lien, then the liens of
certain material-men as a third class of liens. Of these
the Brownstone Company had one for $1,121.35, Henry
M. Leavitt $1,673.43, L. K. Holmes $970.87. Olson was
individually liable for these debts. As the fourth lien
the second mortgage of the Savings Bank was estab-
lished. Olson's lien followed as the fifth lien, and
amounted to $3,708.36. This decree was rendered June
30, 1893, and within due time Howell filed a request for
a stay, which would operate of course to stay the sale on
the mortgage debts. Then began a long series of negotia-
tions for the purpose of forming a plan for purchasing

the property. The evidence shows that from the time the
decree was rendered until February, 1894, when the sale
was had, was a period of business depression and finan-
cial stringency, and that the task of raising money suffi-
cient to buy the property at a price protecting the me-
chanics' liens was, to say the least, arduous. The details
of these negotiations are only important in so far as they
show how Lamb has become interested personally in
the litigation. The first plan was to sell the property
subject to the first mortgage, while the execution of the
decree in so far as it foreclosed that mortgage was sus-
pended by the stay. It was proposed that the lienors, or
some of them, should buy the property and Olson should
proceed with the building until it should be inclosed,
and so put in condition that a loan could be negotiated
which might take care of the mortgages. This plan was
defeated by Howell's withdrawing his stay. The Sav-
ings Bank mortgages had by this time been assigned to
one Miller as trustee for certain associated banks in
Lincoln which had lent money to the Sayings Bank to
tide it through difficulties. When the stay was with-
drawn these banks stood ready to buy in the property to
protect their mortgages. This they could safely do, un-
less there were other bidders, at the lowest price for
which the property could be bought. In this state of
affairs Mr. Lamb undertook to arrange a plan by which
the lien owners should advance money to make a bid on
the property sufficient to protect them. Olson proposed
to raise about $3,000 for this purpose, and there is evi-
dence that Mr. Lamb offered to assist him in so doing.
The stone company, through some of its agents, promised
to do its part. Mr. Leavitt was, however, unable to raise
his portion, and at this juncture Mr. Lamb bought the
Leavitt lien himself, at a discount of about $100. The
court found on sufficient evidence that Lamb made this
purchase without the knowledge or consent of Olson
or of the stone company. It is clear, however, that they
soon after learned of it and acquiesced therein, but they

were not informed that it had been purchased at a discount, and did not learn that fact until long after the sale. The stone company afterwards refused to advance any money. Its officers stated that no agent had authority to agree so to do. The property went to sale without any arrangement being consummated and was bid in by R. D. Muir, who had become the owner of the Holmes lien, for $970.87. Motions to set aside the sale were filed by Olson, the stone company, and by Lamb as owner of the Leavitt lien. In connection with the motions Olson offered, in case of a re-sale, to bid $8,500 and Lamb pledged himself to bid $8,000. The proof shows that Olson was not at that time responsible for such a bid but Mr. Lamb was of ample financial responsibility. The court set aside the sale, and negotiations were renewed for acquiring the property on behalf of the lienors. Of these it is sufficient to say that no result was reached and that the stone company refused to take any part in the purchase. As the time of sale approached Mr. Lamb, in view of his bid of $8,000, made arrangements to borrow $10,000 on the security of real estate by him owned. The arrangements had been perfected but the money had not reached him on February 6, 1894, when the second sale took place. He had on that day only about $150 to his credit in the bank. Mr. Muir, having the Holmes lien to protect, was able to temporarily command the use of a considerable sum, but could not safely buy unless he could almost immediately dispose of the property and re-possess himself of the money. Within a few hours of the time of the sale Muir and Lamb entered into a contract whereby Muir was to bid upon the property and continue to bid until Lamb should indicate that he should stop. If he should get the property under his bid he might within ten days sell it by paying to Lamb the amount of the Leavitt lien. If he should fail to so dispose of it he was to convey it to Lamb, on Lamb's paying him the amount of his bid and $500 additional, in which event Muir was to assign to Lamb the Holmes

lien, which seems to have been a personal judgment against Olson. When the property was offered Miller on behalf of the banks bid $7,000; Muir bid $7,001, and the property was sold to him. Muir failed to dispose of the property, and, Lamb's money arriving, he paid Muir the amount of his bid, either directly or by paying the money to the sheriff and taking up a certified check which Muir had deposited. The sale was confirmed, the sheriff's deed to Muir was delivered to Lamb, and Lamb at once caused to be recorded both that deed and a conveyance from Muir to him.

After the title was thus perfected in Lamb he made a contract with Olson whereby Olson undertook to perform the labor necessary to complete the building according to certain designs which Lamb had made to fit it for a different purpose. By this contract Lamb's ownership of the Leavitt and Holmes judgments was recited, and, allowing certain deductions, their net amount was fixed at $2,500. Lamb agreed to pay Olson certain specified rates for labor performed on the building and on completion of the work to release the judgments. This contract was carried out. The stone company had shipped a quantity of stone which was not inwrought in the building prior to the foreclosure. In completing the building Lamb bought this stone and the stone company received pay from him therefor, knowing that he had become the owner of the property. Soon after the building was completed this suit was brought.

It will be convenient to consider first the case of Olson and then that of the stone company. The position of Olson is that Lamb as his attorney could not without his consent buy the property for himself; that Lamb was guilty moreover of actual fraud which had a double effect: first, to relieve Olson from any estoppel which might arise by reason of his dealing with Lamb as the owner; and second, to deprive Lamb of all right to compensation or reimbursement. That an attorney cannot himself purchase at judicial sale the property in litiga-

tion in which his client is concerned, and hold it to his own use without the consent of his client, is an elementary principle. If he so purchase, the client may at his election treat him as a trustee and enforce the trust. Motives are immaterial, and it is also immaterial whether the client actually lost or gained by the transaction. Such a purchase is contrary to. public policy. In support of this rule there is a multitude of authorities, some of which may be found in 3 Am. & Eng. Ency. of Law 340. It therefore results that from the fact of the relationship of attorney and client alone, Olson had a right to the benefit of Lamb's purchase, and could enforce the trust unless he had first consented to the purchase, or afterwards by word or conduct elected and permitted Lamb to retain the property. Ordinarily undoubtedly his contracting with Lamb after the purchase, knowing him to be the owner, to finish the building for Lamb's benefit, and so encouraging Lamb to expend money in permanent improvements, would bind Olson both as an election and by estoppel. The facts which it is claimed relieve Olson from these consequences being those which it is asserted amount to actual fraud, are so complicated with the question of Lamb's right to reimbursement that the two questions can properly be considered together. We cannot see that the contract with Muir for the purchase of the property was fraudulent or that it was against public policy. It was not, as asserted, an arrangement to chill bids, nor did it seek to prevent anyone from bidding, as was the case in *Goble v. O'Connor*, 43 Neb. 49. The situation was this: Lamb was able to buy the property but did not possess cash on the day of sale sufficient to permit him then to bid. Muir, on the contrary, had an arrangement for the temporary use of sufficient money to enable him to bid, but the necessity of repaying that money within a short time was such that he could not buy without some assurance that the purchase would be taken off his hands. The contract then was an arrangement between two men, neither of whom could bid alone,

but by whom a single bid might be made if they acted in concert, and the case is in this aspect in line with *Gulick v. Webb*, 41 Neb. 706, where it was held that where the object is not to prevent competition or chill bids, but to enable parties to compete where without combining they could not do so, the transaction will be upheld. The remaining facts applicable to this branch of the case are the concealment of this contract from Lamb's clients, the concealment of the fact that Lamb had become the owner of the Leavitt and Holmes judgments for less than their face value, and a fact in connection with the confirmation of the sale which has not yet been stated. So far as Olson is concerned it is clear that he did not know the price at which Lamb bought the Holmes and Leavitt liens; and while he knew that Lamb had become the owner of the property soon after the sale, he did not know the nature of the contract by which that owner-ship was acquired. In view of the duties imposed by law upon an attorney, the failure of Lamb to disclose to Olson these facts must be treated as an unlawful concealment thereof. The other circumstance which has been ad-verted to was that Howell had opposed the confirmation of the sale on the ground that it had been made for $7,001 in the face of Lamb's offer to pay $8,000. For the pur-pose of curing this defect Lamb entered a remittitur of $1,000 on the Leavitt lien, and it was due to this re-mittitur that the sale was confirmed. Olson did not know of this remittitur until after his subsequent con-tract with Lamb had been carried out. We think that Lamb's concealment of these facts from Olson was en-tirely sufficient to relieve Olson from the effect which would otherwise attach to his conduct in afterwards deal-ing with Lamb. An attorney who purchases judgments against his client at a discount cannot be permitted to reap an advantage therefrom. Such a purchase oper-ates for the benefit of the client, and the attorney is entitled only to the amount he paid for the judgments. (*Larcy v. Baker*, 86 Ga. 468; *Sutherland v. Reeve*, 151 Ill.

384.) The remittitur of $1,000 from the Leavitt judgment of course reduced the judgment both as a lien on the property and as a personal obligation of Olson. Olson was therefore indebted on these judgments much less than he supposed. The difference amounted to about $470 on the Holmes judgment and to $1,100 on the Leavitt judgment. Had he known this fact he undoubtedly would not have made the contract with Lamb in the manner in which it was made, adjusting the amount of his debt at $2,500 when in fact it was only about $1,000. Moreover, had he known the terms of the contract between Muir and Lamb he would have known or could have learned that Lamb stood in the attitude of the purchaser at the sale and could be treated as a trustee. Without such knowledge Lamb appeared in the attitude of a subsequent purchaser from Muir. But while these facts, by relieving Olson of his election and of the estoppel, retained in him a right to redeem, we do not think that they deprive Lamb of the right to reimbursement. The sale itself was not actually fraudulent. It was simply against public policy and raised a constructive trust. In every case of this character which we have observed the purchasing attorney has been protected in his disbursement, even where he has been deprived of compensation for his services. The other facts were not inherent in the sale or so connected with it as to taint the purchase with actual fraud. In the accounting Olson can properly be compensated for any loss sustained by him in consequence of the concealment practiced upon him by Lamb, but such concealment was undoubtedly a material inducement to the subsequent contract, and should be given the effect of releasing Olson from those obligations including the settlement effected thereunder. On the other hand we think the contention of Mr. Lamb is sound, that if Olson be released from the terms of that contract affecting him, Lamb should also be released from its other terms. Lamb agreed to pay the price he did for the work in view of the adjustment of Olson's debt

to him at $2,500. The settlement thereby effected not being binding on Olson, the adjustment should be made not according to the contract, but on the basis of what Olson's labor was reasonably worth in completing the building.

In this connection we may here dispose of certain other features of the accounting had. The court allowed Lamb $300 for services in procuring the confirmation of the sale. We must regard this as an unwarranted allowance. The sale was on such terms that Olson was entirely uninterested in its confirmation, and it was evident that Lamb performed these services on his own behalf. We know of no rule which permits an attorney endeavoring to purchase for himself to receive compensation from his client for his efforts in so doing. The decree also includes as an allowance to Lamb $500 for his services in the foreclosure case. These services were rendered on behalf of the firm of Lamb, Ricketts & Wilson and are not a proper set-off in a suit against one member of the firm. Another item allowed Lamb was $750 for services in superintending the building. We think the rule is that even a constructive trustee is entitled to compensation for managing property, where he is chargeable with the rents. The decree charges Lamb with the income from the property; and taxes and other expenses, including a reasonable compensation for management, should in equity be deducted from the amount so allowed.

The accounting in order to ascertain the amount required to redeem proceeded in several particulars on a false basis, and we have not findings in all respects sufficient to enable us to restate the account. As to Olson the case must be reversed and remanded with directions to the trial court to retake the account, allowing to Olson the benefit of the discounts at which Lamb purchased the liens, including the $1,000 remittitur, and to allow him also the reasonable value of his work under the contract to complete the building; to charge Lamb with rents. On the other hand Lamb should be credited with

his actual disbursements in buying the property, in completing the building and in managing the same. He should be allowed nothing for legal services, but receive a reasonable compensation for superintending and managing the property after he acquired title.

We now reach the case of the Prentice Brownstone company, and what has already been stated applies in great measure to this branch of the case. The stone company positively refused to buy the property or to advance any money for the purpose of purchasing it or protecting its lien. The day after the sale an agent of the company was in Lincoln and what occurred is somewhat in dispute. It is very evident that Mr. Lamb told the agent that by some means they were still in position to take the property and protect themselves. According to Lamb the statement was that "he had kept a string to it." It is equally clear that the nature of this "string" was not disclosed, and that the company did not know that Lamb was in effect the purchaser. The company again peremptorily refused to take any steps. Here again by this action and by the company's subsequently selling stone to Lamb to complete the building, knowing that Lamb claimed it as his own, there would be an election allowing him to take the property; but the force of this election was avoided, in the first place, by Lamb's concealing the fact that he was the purchaser and could therefore be treated as a trustee. Moreover the company's rights were unjustly affected by other facts of which it then had no knowledge and of which it did not acquire knowledge until after the building was completed. The bid of $7,001 was just about sufficient to discharge the liens prior to the first group of mechanics' liens, one of which was held by the stone company. The company did not know that the amount of the other liens in this class had been reduced by Lamb's purchase thereof at a discount, nor did it know that the terms of the sale were such as to provide in whole or in part for the discharge of the other liens in the same class, to the

entire exclusion of the lien of the stone company. Then when the sale was confirmed Lamb's remittitur of $1,000 upon the Leavitt lien was to make good his offer to pay $8,000. Had he paid $8,000 the stone company would have received its proportionate part thereof as one of the third class of lienors. By paying only $7,001 and remitting $1,000 on the Leavitt lien Lamb in effect paid the whole of the excess of his offer above $7,001 to himself to apply on the Leavitt lien, entirely excluding the stone company which stood in equal priority. Such a transaction cannot for a minute be tolerated. The stone company must also be permitted to redeem. In adjusting its account it should be allowed credit for such portion of this $1,000 as it would have been apportioned had the bid been that much higher and no remittitur entered. It should also be given the benefit of the discounts on the two liens.

Finally, the court erred in entering a judgment absolute against Lamb for the amount which he obtained by these discounts and by the remittitur, and then calculating the amount required from Olson to redeem at the full sum. This would require Olson to pay the whole amount and recover part back on his judgment. The amount owing Olson from Lamb should be deducted in ascertaining the amount required to redeem, and any judgment against Lamb should be effective only in case of Olson's failure to redeem.

The judgment is reversed and the case remanded with directions to proceed in accordance with this opinion.

REVERSED AND REMANDED.