## FIRST TRUST CO. OF LINCOLN, NEB., v. RICKETTS.
### No. 9986.

Circuit Court of Appeals, Eighth Circuit.
Nov. 14, 1934.

Frank D. Williams, of Lincoln, Neb. (Earl Cline, of Lincoln, Neb., on the brief), for appellant.

R. A. Bochmer, of Lincoln, Neb. (Perry W. Morton, of Lincoln, Neb., on the brief), for appellee.

Before GARDNER, SANBORN, and WOODROUGH, Circuit Judges.

SANBORN, Circuit Judge.

Prior to bankruptcy, the Lincoln Trust Company, of Lincoln, Neb., which will be referred to as the bankrupt, was engaged in the business of making and selling mortgage loans. On March 31, 1927, Ethel Harriman, as mortgagor, executed and delivered to the bankrupt, as mortgagee, a mortgage covering lands in Scotts Bluff county, Neb., as security for the payment of 11 notes, aggregating $7,000, due March 31, 1932, with interest at the rate of 6 per cent. per annum, payable semiannually, and represented by coupon notes. The notes or bonds secured by this mortgage, together with interest coupons, were payable to the bankrupt at its place of business in Lincoln. They were sold to certain of its customers. The mortgage provided that the mortgagor should pay taxes and assessments and keep the buildings insured against fire and tornado; that if the mortgagor failed to pay such expenses, the mortgagee might pay them, "and the sum so advanced with interest at ten per cent per annum shall be repaid by mortgagor, and this mortgage shall stand as security therefor." It also provided that, in case of the failure of the mortgagor to pay either principal or interest when the same became due or to comply with any of the terms or conditions of the mortgage, the whole sum of money secured by the mortgage, at the option of the mortgagee, might be declared to be due, or the mortgagee might foreclose only as to the sum past due without impair-

ing the lien of the mortgage. The mortgage contained this provision: "In case of any of the bonds or coupons secured hereby are held by other parties than the mortgagee, the parties hereto hereby constitute and authorize the Lincoln Trust Company of Lincoln, Nebraska, as trustee under this mortgage, for the use and benefit of the holders of the debts secured hereby, with full power and authority upon maturity of this mortgage or the debts secured thereby, either by the lapse of time or by failure to perform any of the terms or conditions hereof, to foreclose or enforce collection or payment of this mortgage and the debts secured thereby, or in case of loss or damage to collect and receipt for insurance thereon; to satisfy and release of record or otherwise this mortgage or said debts; to make distribution of the proceeds thereof to the holders or owners of said bonds or coupons after payment of the costs and expenses thereof, and to do all things necessary or suitable to the performance of said duties and the exercise of said powers."

The bondholders received from the bankrupt, upon presentation of their interest coupons, all interest due on their bonds up to and including the 31st day of March, 1932, but the mortgagor only paid interest to and including September 30, 1929, and all interest thereafter was advanced by the bankrupt out of its own funds. The mortgagor failed to pay taxes for the years 1927 and 1928, and the mortgaged premises were sold for nonpayment thereof. On April 15, 1930, the bankrupt redeemed from the tax sale, and, in so doing, paid out $1,815.20. On June 20, 1930, the bankrupt paid the 1929 taxes, amounting to $840.35, and between April 17, 1930, and May 15, 1930, the bankrupt paid to the bondholders, upon their presentation of the interest coupons which were due March 31, 1930, the sum of $210. On July 7, 1930, the bankrupt commenced a suit to foreclose the mortgage for the taxes and interest which it had paid and which should have been paid by the mortgagor. While the suit was pending, and on February 2, 1931, the mortgagor gave to the bankrupt a quiclaim deed of the mortgaged premises, and thereupon the bankrupt took possession and control thereof, and collected rents to the amount of $1,109.33, paid additional taxes amounting to $854.30, insurance premiums, $45.94, repairs, $15.35, and clover seed, $52.74. The total amount of interest advanced by the bankrupt to take up interest coupons was $1,050. Although this mort-

gage was virtually in default from the beginning because of the nonpayment of taxes by the mortgagor, no bondholder was advised of any default until after July 9, 1932, when the Lincoln Trust Company was adjudged a bankrupt. Thereafter, the First Trust Company of Lincoln, Neb., was appointed by the state court successor trustee for bondholders under various trust deeds and mortgages in which the bankrupt had been named as trustee. The transfer of the trust property to the successor trustee was made upon express condition that the bankruptcy court should retain exclusive jurisdiction of the trust properties for the determination of any liens, right, titles, or interest the bankrupt might have in the property so transferred. Among the trusts transferred to the First Trust Company was the Harriman mortgage.

The successor trustee was of the opinion that the bankrupt, in taking title to the Harriman lands and in paying taxes and other expenses in connection therewith, including interest upon the mortgage, was not acting as trustee for the bondholders, but in its own right, and that it was the owner of the lands, subject to the mortgage. Application was therefore made by the successor trustee to the referee for leave to foreclose the mortgage. In response to this application, the trustee in bankruptcy of the Lincoln Trust Company asserted that the bankrupt, in taking title to the mortgaged premises, in paying taxes and insurance, and in making other disbursements, including the interest advanced, had acted solely in its capacity as trustee for the bondholders; that it had necessarily expended on their behalf $4,816.01, and had received rents of $1,109.33, leaving a net deficit of $3,706.68, for which it was entitled to reimbursement. He asked that, as trustee for the bankrupt, he be given a first lien upon the mortgaged lands for that amount, that the lands be sold, and the proceeds applied to the payment of the amount adjudged to be due him.

The referee reached the conclusion that, in paying taxes and insurance, in taking a deed to the land, and in making expenditures for repairs, etc., the bankrupt had acted as trustee for the bondholders and for their best interests and was entitled to reimbursement and a first lien upon the lands for taxes and insurance premiums, without interest, and to a deduction from rents received of other necessary carrying charges; that in advancing funds for interest, it was purchasing and not paying the interest coupons,

and that it had a lien for such coupons of equal rank with the lien of the bondholders. He ordered a sale of the lands and the application of their proceeds, after the payment of costs, first to the payment of the bankrupt's first lien for taxes and insurance; the balance to be applied to the payment of the bonds and unpaid interest coupons, including those held by the trustee in bankruptcy.

The First Trust Company, as successor trustee, filed a petition to review the order of the referee. The court below reached the conclusion that the referee was right, and confirmed his order. This appeal followed.

■ With respect to the advances made by the bankrupt for taxes, insurance, and the preservation of the trust property, the contention of the appellant is that the record shows that the bankrupt was acting for itself and in its own interest, and not in the interest of the bondholders.

It is possible that the bankrupt intended to take title to the mortgaged real estate, to pay the carrying charges, and eventually to pay off the bonds out of its own funds and to sell the land for its own reimbursement, keeping any profit which might accrue from a sale. The fact is, however, that the bankrupt was trustee for the bondholders, that it bore toward them a relation of trust and confidence which the law would not permit it to violate, and that it could not acquire an interest in the trust property adverse to them. Michoud et al. v. Girod et al., 4 How. (45 U. S.) 503, 11 L. Ed. 1076; Robertson v. Chapman, 152 U. S. 673, 681, 14 S. Ct. 741, 38 L. Ed. 592; Magruder v. Drury and Maddox, Trustees, 235 U. S. 106, 119, 35 S. Ct. 77, 59 L. Ed. 151; Trice v. Comstock (C. C. A. 8) 121 F. 620, 61 L. R. A. 176; J. H. Lane & Co. v. Maple Cotton Mills (C. C. A. 4) 232 F. 421; Baker et al. v. Schofield, Receiver, etc., 243 U. S. 114, 119, 37 S. Ct. 333, 61 L. Ed. 626; Jackson, Receiver, etc., v. Smith, 254 U. S. 586, 588, 41 S. Ct. 200, 65 L. Ed. 418; Johnson v. Umsted (C. C. A. 8) 64 F.(2d) 316, 320, and cases cited; Johnson v. Hayward, 74 Neb. 157, 103 N. W. 1058, 107 N. W. 384, 5 L. R. A. (N. S.) 112, 12 Ann. Cas. 800; Dana v. Duluth Trust Co., 99 Wis. 663, 75 N. W. 429; Marshall v. Lovell (D. C. Minn.) 11 F.(2d) 632, 639, affirmed (C. C. A. 8) 19 F.(2d) 751.

Under the circumstances, a finding by the referee that the bankrupt was pursuing a course of conduct which it could not legally pursue could hardly be sustained.

It is also contended by the appellant that, since the bankrupt did not deal fairly with the bondholders and gave them no notice that the mortgagor had failed to pay taxes, insurance, and interest, and had deeded the property to the bankrupt, it is not entitled to reimbursement.

■ The general rule is that a trustee under a mortgage is entitled to be reimbursed for all expenditures authorized or contemplated by the mortgage, and for all expenditures made in preserving the trust property, and that he has a lien upon the trust property for the amount of such expenditures.

In Gisborn v. Charter Oak Life Insurance Co., 142 U. S. 326, 337, 12 S. Ct. 277, 280, 35 L. Ed. 1029, the court said: "In 2 Pom. Eq. Jur. § 1085, it is said that 'the trustee is entitled to be allowed, as against the estate and the beneficiary, for all his proper expenses out of pocket, which include all payments expressly authorized by the instrument of trust, all reasonable expenses in carrying out the directions of the trust, and, in the absence of any such directions, all expenses reasonably necessary for the security, protection, and preservation of the trust property, or for the prevention of a failure of the trust.'"

See, also, Bibb v. Allen, 149 U. S. 481, 498, 13 S. Ct. 950, 37 L. Ed. 819; 26 R. C. L., page 1281, § 132; 65 C. J. 729, § 593; Olson v. Lamb, 56 Neb. 104, 76 N. W. 433, 71 Am. St. Rep. 670; United States v. Swope (C. C. A. 8) 16 F.(2d) 215. Even in the case of a constructive trust, reimbursement for the costs and carrying charges of the property impressed with the trust is ordinarily allowed.

In Johnson v. Umsted (C. C. A. 8) 64 F. (2d) 316, supra, we said, on page 324: "The record does not show whether Sid Umsted was fully reimbursed for the purchase price of the land and for carrying charges out of royalties received by him during his lifetime. If he was not, upon an accounting for royalties received by his estate, that matter can be adjusted."

See, also, Dana v. Duluth Trust Co., 99 Wis. 663, 75 N. W. 429, supra; Johnson v. Hayward, 74 Neb. 157, 103 N. W. 1058, 107 N. W. 384, 5 L. R. A. (N. S.) 112, 12 Ann. Cas. 800, supra.

■ In order to preserve the security for the bondholders, it was necessary for some one to pay the taxes. If they had not been paid, the security would have been lost. Under the mortgage, the bankrupt was given the

right to pay them. There was no provision that the bondholders should be notified in case of such payment. It is true that the instrument provided that the mortgagor should repay the taxes, and that the mortgage should stand as security therefor; but we think that this was not equivalent to a provision that, if the mortgagor failed to repay the taxes, the bankrupt, as trustee under the mortgage, should not be entitled to be reimbursed, under such circumstances as are here present, for such taxes as it was necessary to pay to save the security for the bondholders.

Substantially the same contention with regard to notice which is being made by the appellant here was made in the case of Anderson v. Pennsylvania Hotel Co. (C. C. A. 5) 56 F.(2d) 980, with respect to a failure of the trustee to notify the bondholders that the mortgagor had failed to take up maturing bonds sent in for retirement. The court in that case said [page 981 of 56 F.(2d)]: "The second objection that the bank as trustee has misled the bondholders by not notifying them that the matured bonds had not been paid is not well taken. There is no provision in either mortgage making it the duty of the trustee to notify bondholders in case of default in payment."

While there is authority indicating that a failure to notify bondholders within a reasonable time of defaults, such as occurred in connection with this mortgage, would deprive the trustee of any lien for its disbursements (Marshall & Ilsley Bank v. Guaranty Inv. Co., 213 Wis. 415, 250 N. W. 862; and compare Marshall & Ilsley Bank v. Hackett, Hoff & Thiermann, Inc., et al., 213 Wis. 426, 250 N. W. 866), there would seem to be no impropriety in requiring the trust estate to reimburse the trustee for such expenditures as would have been necessary had the trust been executed with the greatest fidelity. We think that the trustee in bankruptcy is entitled to be reimbursed to the extent of the taxes, insurance, and other necessary carrying charges paid by the bankrupt in preserving the bondholders' security.

But the money advanced by the bankrupt for the taking up of interest coupons presented for payment stands in a very different situation. There was no provision in the mortgage that the mortgagee or trustee might pay such interest and have a lien therefor, there was no obligation upon it to advance interest, and the advancement of interest had no relation to the preservation of the security.

The record shows that up to July, 1931, the practice of the bankrupt had been to pay interest coupons when presented, whether funds had been furnished by borrowers or not, and that nothing was said to its customers about advancements of interest. In July, 1931, the practice was changed, and thereafter interest was not advanced or paid unless it had been paid to the bankrupt by the borrowers, and after that time the customers were notified in case funds had not been furnished by the borrowers. After July 1, 1931, the interest on mortgages on lands to which the bankrupt had taken title "was paid if instructed by another department." With respect to this Harriman mortgage, no bondholder knew or had any reason to know that the interest coupons which were presented for payment to the bankrupt were not paid out of funds furnished by the borrower, and the first intimation any bondholder had that the mortgage was in default, or that the bankrupt had advanced interest, was after bankruptcy. The failure of the bankrupt to notify the bondholders of default and of the failure of the mortgagor to pay interest is attributable to only one thing, and that is the desire of the bankrupt to maintain a market for the securities which it was selling. The court below said: "With reference to the taking up of the interest coupons, we see no impropriety in the trustee taking up and holding these coupons. It may be gathered from the evidence that the trust company was engaged in the negotiation and sale of mortgage securities. The bondholders were certain of its customers. It was to the interest of the trust company that its customers should not be disturbed concerning their investments. No preference or priority is claimed for its coupons. Its claimed interests under these coupons are precisely those of the other bondholders, and there is nothing to indicate any breach of duty as against them."

The theory of the referee and of the court below was that the taking up of the interest coupons by the bankrupt might properly be regarded as a purchase by it of the coupons. We can find no basis for such a conclusion in the evidence. There is not a scintilla of evidence that any bondholder ever intended to sell his coupons to the bankrupt. The coupons were presented to the proper person, in the proper way, and at the proper time and place, for payment, and were paid in exactly the same manner that

they would have been paid had the borrower, instead of the bankrupt, furnished the money.

The trustee in bankruptcy relies largely upon the case of Ketchum v. Duncan, 96 U. S. 659, 24 L. Ed. 868, in which the court, by a five to four decision, held that certain interest coupons were purchased and not paid. As we read the opinion in that case, it supports the contentions of the appellant. There the court held that, while it is undoubtedly true that it is essential to a sale that both parties should consent to it, the intent to sell or the assent of the former owner to a sale need not be expressly given, but may be inferred from the circumstances of the transaction; that a transfer of possession is presumptively a transfer of title, and especially is this true when the transfer is made by one who is not a debtor to one who is under no obligation to receive or pay the interest coupons. But the court said, page 662 of 96 U. S.: "We may admit, also, that 'where, as in this case, a sale, compared with payment, is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal debt, the intent to sell should be clearly proved.'"

The court pointed out that there were circumstances in that case which would have put the bondholders upon inquiry that their coupons were being purchased and not paid. It said, page 663 of 96 U. S.: "In the present case, there was much in the circumstances attending the transfer of the possession of the coupons from the original holders to Duncan, Sherman, & Co., or their agents, tending to show that those holders could not have believed the payment made to them extinguished the securities, so that they could not thereafter be set up by the transferees against the railroad company. Those circumstances, certainly, should have awakened their attention and led them to inquiry. The coupons were not paid in the usual manner, or at the usual place, or by the persons accustomed to pay them."

It seems clear that, in the absence of these circumstances to which the Supreme Court points as indicating that the bondholders were charged with knowledge that their coupons were being purchased, it would have been held that the coupons had been paid and extinguished, and not purchased.

In Wood v. Guarantee Trust & Safe-Deposit Co., 128 U. S. 416, at page 424, 9 S. Ct. 131, 133, 32 L. Ed. 472, where it was held that interest coupons were paid and not purchased, the court said: "In Ketchum v. Duncan stress was laid on these circumstances, viz.: That the persons alleged to have paid the coupons had no connection with the company issuing the coupons, or interest in it; that they had repeatedly and publicly notified the holders of the bonds and coupons that the coupons were to be purchased, not paid; and that the coupons were carefully received and preserved uncanceled. In the case at bar the conditions are radically different. Starr is essentially (that is, from a business point of view) the water-works company, owning, as he does, 19,500 of its 20,000 shares of stock. Its prosperity is manifestly his prosperity, its disaster his disaster, and any disbursement made by it is substantially made by him. There is therefore no inherent improbability that he intended to pay the coupons, as he, indeed, instructed his agents, the brokers, that he did."

And on page 425 of 128 U. S., 9 S. Ct. 131, 134, the court said: "In brief, Starr was engaged in floating these bonds. They were not, as the testimony and the history of the case shows, good bonds. He was very careful to prevent anything from transpiring that would injure their credit. He cut off the coupons that were due and unpaid, so long as the bonds remained in his possession, and put up some money to redeem coupons which fell due on bonds that had been sold, so long as he was still engaged in selling other bonds. It looks very much as if Mr. Starr had dug a pit, and was anxiously keeping the pathway to it in good order. It would be inequitable, in our opinion, to allow him to bring forward these coupons as the basis of any preference over, or of even co-equal rights with, those to whom he sold his bonds; and the plaintiff, having taken these coupons when overdue, had no greater rights than he had in this respect. If the courts were to sanction such claims, the commercial securities of the world would be nullified."

It might not be fair, upon this record, to say that the bankrupt in this case had dug a pit and was anxiously keeping the pathway to it in good order, but it is very apparent that it had no desire to place any obstructions in the beaten pathway to its door. Its advancing of interest to its customers is to be attributed to a desire on its part to preserve an unimpaired market for its mortgage bonds, rather than to a desire to confer a boon upon them by purchasing their interest coupons.

In Venner v. Farmers' Loan & Trust Co. of New York (C. C. A. 6) 90 F. 348, at page 359, Judge Lurton, afterwards Mr. Justice Lurton, in delivering the opinion of the court, said: "It is therefore a sound principle of law that the holder must intend a sale, and consent to a sale, and a mere transfer of title, when he parts with such preferred coupon, or the transaction will be treated as a cancellation and payment. The true doctrine is that announced in Ketchum v. Duncan, supra, that 'it is essential to a sale that both parties should consent to it,' and that 'where a sale with payment is prejudicial to the holder's interest, by continuing the burden of the coupons upon the common security, and lessening its value in reference to the principal of the debt, the intent to sell should be clearly proven.' To the same effect are Farmers' Loan & Trust Co. v. Iowa Water Co. [C. C.] 78 F. 881, and United Waterworks Co. v. Farmers' Loan & Trust Co., 49 U. S. App. 493, 27 C. C. A. 92, 82 F. 144."

See, also, Security Trust Co. of Freeport v. American Inv. Co., 34 N. M. 551, 286 P. 159, 160; Morton Trust Co v. Home Telephone Co. of Trenton, 66 N. J. Eq. 106, 57 A. 1020, 1024; Baker v. Meloy, 95 Md. 1, 51 A. 893; Ferree v. New York Security & Trust Co. (C. C. A. 8) 74 F. 769; Farmers' Loan & Trust Co. v. Iowa Water Co. (C. C. S. D. Iowa) 78 F. 881, 885; United Waterworks Co. v. Farmers' Loan & Trust Co. (C. C. A.) 82 F. 144, 146; Marshall & Ilsley Bank v. Guaranty Inv. Co., 213 Wis. 415, 250 N. W. 862, supra; Marshall & Ilsley Bank v. Hackett, Hoff & Thiermann, Inc., et al., 213 Wis. 426, 250 N. W. 866, supra.

Our conclusion is that the interest coupons presented by the bondholders to the bankrupt, while not marked "paid" or "cancelled" by it, were paid and not purchased, and are not entitled to share with the bonds in the proceeds of a sale of the mortgage security. Any right which the trustee of the bankrupt may have to look to the security for reimbursement for interest advanced is inferior to the liens of the bondholders.

The order of the referee, which was confirmed by the lower court, was right in so far as it provided that the trustee in bankruptcy should have a first lien upon the mortgage security for the amount of taxes and insurance paid by the bankrupt in the preservation of the trust property, without interest, and for the reimbursement of the trustee in bankruptcy for other necessary carrying charges out of rents received, but wrong in so far as it allowed the trustee in bankruptcy a lien for interest advanced, of equal rank with the liens of the bondholders. The case is remanded, with directions to modify the order in conformity with this opinion.