ALMA P. HARVEY, as Ancillary Executrix of the Estate of GEORGE HARVEY, Deceased, Plaintiff, *v.* GUARANTY TRUST COMPANY OF NEW YORK and Others, Defendants.

Supreme Court, New York County, April 24, 1929.

*Larkin, Andrews & McNaughton* [*Alexander S. Andrews* of counsel], for the plaintiff.

*Siebert & Riggs* [*R. E. T. Riggs* of counsel], for the defendants.

FRANKENTHALER, J.   During the year 1925 Col. George Harvey, claiming to be the holder of various bonds and coupons issued by the Atlantic Coast Electric Light Company, hereinafter termed the " mortgagor," commenced this action against the Guaranty Trust Company of New York, successor trustee under the trust indenture given to secure the series of bonds and coupons of which those referred to were part.   The plaintiff's claim, briefly stated, is that the defendant wrongfully delivered to the mortgagor a satisfaction of the deed of trust without the knowledge or consent of the plaintiff and without payment of the bonds and coupons held by the latter.   Accordingly, judgment is sought directing the trustee to account and awarding the plaintiff the sum of $44,150 asserted to be the damages suffered by him as a result of defendant's misconduct.

While this suit was awaiting trial Col. Harvey died and his executrix was thereupon substituted as plaintiff by order of this court   References hereafter made to the " plaintiff " will apply to Col. Harvey except where the context otherwise indicates. During the pendency of the action two additional defendants were permitted to intervene, viz., Eastern New Jersey Power Company, which took over the assets and assumed the liabilities of the mortgagor, and Coast Cities Railway Company, to which reference will be made presently.

On July 15, 1896, the mortgagor executed and delivered to the State Trust Company, a New York corporation (the predecessor

of defendant Guaranty Trust Company of New York), as trustee, a deed of trust covering certain properties in the State of New Jersey, to secure a proposed issue of 500 bonds of the mortgagor in the sum of $1,000 each, together with interest coupons thereto attached. The bonds were to mature June 1, 1945, and were redeemable at the option of the mortgagor on June 1, 1900, or any interest day thereafter, at 105 per cent, together with accrued interest.

Article II of the trust indenture provided for the acceleration of the maturity of the entire principal of the bonds by the holders of a majority of those then outstanding upon the occurrence and continuation for four months of interest defaults and/or other breaches of covenant, " provided, however, that in no event shall any individual holders of the bonds secured by this indenture have the right to institute any suit or proceeding in his own behalf or for his individual protection for the payment of the principal or interest of any such bond, and that all remedies for the enforcement of the payment of such principal and interest shall be had and taken only by process by and in the name of the Trustee of the mortgage or its successor in the trust for the equal benefit of the bond holders and only pursuant to the terms of this instrument."

The first two paragraphs of article XVI read as follows:

" The Trustee hereunder, and its successor or successors in the trust, shall not be in any manner whatever responsible for the default or misconduct of a co-Trustee or co-Trustees, nor for the default or misconduct of any agent or attorney appointed pursuant to this indenture, nor for anything whatever in respect to the premises or the trust hereby created, except its own fraud or willful misconduct.

" In case at any time it shall be necessary and proper for the Trustee to make any investigation respecting any facts preparatory to taking or not taking any action, or doing or not doing anything as such Trustee, the certificate of the Company (the mortgagor) under its corporate seal, attested by the signature of its President and the affidavit of one or more Directors, shall be conclusive evidence of such fact to protect the Trustee in any action that it may take by reason of the supposed existence of such fact."

Article XIX contained the statement that " Holders of overdue coupons shall, for all purposes under this indenture, be deemed holders of bonds to the same amount," and article XXII declared that " Upon the payment of the principal and interest of all the bonds hereby secured, the estate hereby granted to the Trustee shall be void, and the right to all the real and personal property

hereby granted and conveyed shall revert to and revest in the Company, its successors or assigns, in law and in equity, without any acknowledgment of satisfaction, reconveyance, surrender, re-entry or other act."

Nowhere in the indenture is there any express provision for the authentication by the trustee of duplicate bonds or coupons, or for the delivery of a satisfaction of the mortgage on payment of all bonds and coupons or otherwise.

Early in 1924 the mortgagor elected, pursuant to the option granted in the indenture, to redeem all outstanding bonds on June 1, 1924, at 105 per cent plus accrued interest. The stock of the Atlantic Coast Electric Railway Company, which was the sole stockholder of the mortgagor, was about to be sold by the estate of H. H. Rogers and the purchaser wished to satisfy the trust indenture covering the mortgagor's property so that it might be replaced with a mortgage securing a new and larger issue of bonds. At the time 201 bonds were outstanding and recognized as valid by the mortgagor; 45 others were in the trustee's possession, having been held for the purpose of retiring an underlying issue of bonds made by the Neptune Electric Company, a previous owner of the property; and 234 bonds were delivered to the mortgagor by the Rogers estate. To what extent, if any, the bonds were taken into consideration in fixing the price obtained for the stock of the railway company, which carried with it ownership of the mortgagor, does not appear. These 234 bonds thus became treasury bonds of the mortgagor. That left outstanding the 20 bonds held by the plaintiff herein. In addition there were outstanding some 539 coupons, as well as 926 coupons held by plaintiff. All but 14 of the latter pertained to the 20 bonds in his possession.

Preparatory to requesting the trustee to satisfy the indenture the mortgagor applied to it for the issuance of a duplicate bond in lieu of bonds numbered 242, 418 to 428, inclusive, 436, 437, and 468 to 473, inclusive, these being the numbers of plaintiff's 20 bonds. The application read as follows:

" THE ATLANTIC COAST ELECTRIC LIGHT COMPANY

" *February* 27, 1924.

" GUARANTY TRUST COMPANY OF NEW YORK,
" 140 Broadway,
" New York City.

" GENTLEMEN.— The Atlantic Coast Electric Light Company hereby requests you to authenticate and deliver $20,000 Temporary Bond of The Atlantic Coast Electric Light Company under the mortgage, dated July 15, 1896, to the State Trust Company in the

place and stead of lost bonds as per the enclosed resolution. Kindly hold this bond when authenticated in your custody and possession subject to the further order of the Company.

"Very truly yours,

"THE ATLANTIC COAST ELECTRIC LIGHT COMPANY

"By S. F. HAZELRIGG,

[Corporate Seal.] *President*

"Attest:

"B. H. MORRIS,

"*Secretary.*"

The "enclosed resolution" of the board of directors of the mortgagor recited that the twenty bonds were not included among those recognized by the company as outstanding; that they had been authenticated and delivered to the mortgagor but had not been sold, pledged, hypothecated or disposed of by the latter for value or otherwise; that they had been lost and could not be found after diligent search by the mortgagor's employees, and that the mortgagor's records did not disclose their "whereabouts." Accordingly the resolution authorized application to be made to the trustee for a duplicate bond.

There was delivered to the trustee in this connection an affidavit by one Cade, treasurer of the mortgagor, who is conceded to have been a director as well. The affidavit stated: "The company is the owner of $20,000 par value bonds authenticated and issued by the Trustee and delivered to the company, said bonds being numbered 242, 418–428 inclusive, 436, 437, 468–473 inclusive, and said bonds are treasury bonds of The Atlantic Coast Electric Light Company. I am informed and believe that prior to the time that I became Treasurer of the company, said bonds were pledged for collateral security of loans of The Atlantic Coast Electric Railroad Company, and that said loans have been paid."

In addition the affidavit stated that Cade had made diligent search for the bonds in the records of the mortgagor and among the archives of the estate of H. H. Rogers, who was "the owner of large interests in the Atlantic Coast Electric Railroad Company and the Atlantic Coast Electric Light Company." It stated further that the mortgagor "has not sold, assigned, transferred or hypothecated said bonds, or any interest therein in any manner whatsoever" (apparently intending to except, however, the pledge previously referred to) and that it had received no value for them. In conclusion Cade deposed that no coupons detached from the bonds had been presented for payment since he had become treasurer, that none had been paid, and that the mortgagor did not recognize them as outstanding in its financial reports.

In order to induce the trustee to issue the duplicate bond for $20,000 it was given an indemnity bond executed by the Fidelity and Deposit Company of Maryland and by the mortgagor, in the sum of $61,000, agreeing to save the trustee harmless against all claims, actions, liabilities, losses and damages, by reason of the issuance of a duplicate bond without surrender of the originals.

The trustee thereupon authenticated a duplicate bond and retained the same at the mortgagor's request, awaiting further instructions. Immediately thereafter the mortgagor delivered to the trustee a certified copy of resolutions passed by the former's board of directors electing to redeem the 201 outstanding bonds at 105 per cent and accrued interest, and requesting the trustee to cancel the duplicate bond as well as the treasury bonds and those in possession of the trustee in connection with the retirement of the Neptune Electric Company bonds. Two hundred and thirty-four thousand five hundred and seventy-five dollars was paid to the trustee by the mortgagor, of which $211,050 was to redeem the 201 outstanding bonds at 105 per cent, $10,050 was to pay accrued interest to December 1, 1924, and $13,475 was to pay 539 unpaid coupons then outstanding. No funds were delivered to the trustee to redeem the 20 bonds held by the plaintiff or the coupons pertaining thereto.

On receipt of the documents and moneys referred to, the trustee, at the mortgagor's request, executed and delivered to the latter a satisfaction of the trust indenture. This was duly recorded on March 1, 1924, and the property which had been covered by the trust deed, concededly worth far in excess of the entire bond issue of $500,000 and all unpaid coupons, was sold to defendant Eastern New Jersey Power Company. It is now subject to a new mortgage securing an issue of several million dollars worth of bonds at present outstanding in the hands of innocent purchasers.

The plaintiff maintains that the trustee had no right, while original bonds and coupons were outstanding in his rightful possession, to satisfy the trust indenture and thereby deprive him of the security which it held to insure the payment of his bonds and coupons. Only if the trustee's conduct complained of was wrongful and constituted a breach of trust can the plaintiff recover judgment against it.

Although the indenture expressly provided for automatic revesting of the mortgaged property on payment of the bonds and interest, and explicitly dispensed with the necessity of the execution of a satisfaction piece, I am prepared to assume, for the purposes of this opinion, that the trustee nevertheless had the right to comply with the mortgagor's request for a formal satisfaction *on the pre-*

*sentation to it of all the original bonds and coupons authenticated by it or its predecessor, except those which might be provided for by the deposit with it of sufficient funds to redeem them.* It seems to me, however, that the trustee possessed no authority, at least in the absence, as here, of an express provision permitting it, to extinguish the indenture by releasing the entire security without requiring the presentation of all the bonds and coupons previously authenticated or the deposit of moneys sufficient to redeem those not presented. The conceded absence of the twenty bonds held by the plaintiff certainly placed the trustee upon notice of the possibility that they might be outstanding in the hands of persons entitled to enforce them. As to coupons which had not been presented though they bore maturity dates prior to June 1, 1924, the practice pursued by the trustee of cremating all presented coupons and keeping a record of those cremated may well be said to have placed it upon notice of the possibility that those which had not been cremated might be similarly outstanding. As to those coupons which matured after December 1, 1913, the trustee was assuredly put on notice by reason of Cade's affidavit to the effect that no coupons pertaining to the twenty bonds had been presented during a period of more than ten years prior to the making of his affidavit.

A trustee under a corporate indenture may for some purposes be regarded as the agent of the mortgagor, but it cannot be denied that for other purposes it is the representative of the bondholders for whose benefit it holds the mortgaged security. This aspect of a trustee's functions is particularly emphasized in the indenture here involved by the provision, previously referred to, prohibiting bondholders from enforcing their bonds and coupons in any manner except through the trustee. There may be room for divergence of opinion with regard to the various obligations owing from a trustee to bondholders, for example, as to whether it is under an *affirmative* duty to attend to the preservation of the security. Even an express provision exempting a trustee from the obligation to refile a chattel mortgage has been held to be ineffective to exculpate the trustee. Thus in *Green* v. *Title Guarantee & Trust Co.* (223 App. Div. 12; affd., without opinion, 248 N. Y. 627) the Appellate Division in this department McAvoy, J., writing for the court, said (at p. 16): " The exculpatory clause cannot avail. The only person who could file the chattel mortgage is the trustee, and it could not excuse itself from doing something which was absolutely necessary to the preservation of the lien." To the same effect is *Benton* v. *Safe Deposit Bank* (134 Misc. 727). (See, also, *Miles* v. *Vivian*, 79 Fed. 848, C. C. A., 2d Circuit.) But, as I view it, there can be little doubt that a trustee is at least under the *negative* duty of

refraining from destroying the very security whose retention for the benefit of bondholders constitutes the primary and fundamental object of the trust indenture itself. Were a trustee permitted to release mortgaged property on nothing but the statement of the mortgagor that all outstanding bonds had been paid, the protection afforded to bondholders would be illusory indeed. If a trustee owes any duties whatsoever to the bondholders under the mortgage, the very first in importance must be that of abstaining from surrendering the trust estate to the mortgagor and leaving the bondholders without any security. An indenture capable of satisfaction on the mere say-so of the grantor without the knowledge or consent of the bondholders might better not have been executed at all. It would be not merely futile, but what is far worse, an instrument of public deception.

It remains in this connection to consider the effect, if any, of the so-called exculpatory provisions of article XVI of the indenture. Fairly construed, the exemption of the trustee in the 1st paragraph of that article from liability " for anything whatever in respect to the premises or the trust hereby created, except its own fraud or willful misconduct " appears to apply only to those matters specifically referred to in the instrument itself. The indenture under consideration contained no provision requiring or permitting the trustee to satisfy it. On the contrary, it expressly dispensed with the necessity of a formal satisfaction. Nor was there any authority granted to authenticate duplicate bonds or coupons. Assuming, however, that the exemption clause is regarded as applicable to the situation here presented, I am of opinion that it cannot properly be given effect. The tendency of our courts appears to be in the direction of refusing to permit such an exculpatory provision to prevail where the misconduct of the trustee is so repugnant to the trust as to defeat its very purpose. The language quoted from the *Green Case* (*supra*) affords an excellent illustration. In a recent article in the Harvard Law Review (Dec. 1928) there appears the following apposite statement (p. 244): " It is therefore apparent that not every obligation of a corporate trustee is found expressed or implied in the covenants of the indenture, but that inherent in the relation there are duties which, even if they may admit of something less than full performance, rise beyond their disavowal and demand at least a reasonable measure of responsibility for their discharge. The requirement that the trustee must record or file the mortgage seems to be clearly such a duty. The duties assumed by a trustee have been declared to be not only those defined by the instrument but also those ' superimposed upon the trustee, created by the relation of the parties and the situation of the trust fund.'

It is not the intention of the parties that the trustee shall be ' a mere dummy,' and concerning matters which go directly to the integrity of the security, the trustee must expect to be held to the exercise of the care and diligence which would naturally be expected of one acting in like circumstances to protect his own property. Such is the plain implication of the *Rhinelander* case.* That case stands in striking contrast to the *Browning* case,† where the court, relying directly upon the contract construction, declared that the responsibility of the trustee should be ' determined from the provisions of the mortgage which constitute the contract of the bondholders with the trustee * * *.' "

Even if the view be taken that the exculpatory provision is not only applicable here but also effective, it seems to me that it is not going too far to characterize the trustee's action as " willful misconduct " within the meaning of the indenture. It was certainly " willful misconduct " in the sense of an unauthorized and wrongful act, deliberately and intentionally done with knowledge that not all the original bonds and coupons had been surrendered and with an appreciation of the possibility that they might be in the hands of innocent holders for value. The trustee appears to have been cognizant of the fact that it was doing something irregular, calculated to imperil the rights of possible *bona fide* holders of the missing originals and quite likely to result in its being held liable to the latter. This recognition by the trustee of the doubtful propriety of its conduct is indicated by its exaction of the indemnity agreement previously referred to. In connection with this phase of the case it is interesting to observe that in *Warren* v. *Pazolt* (203 Mass. 328, 347) the court said: " Wilful default means intentionally making away with the trust property and a wilful neglect means such reckless indifference to true interests of the trust as to amount to or partake of a wilful violation of duty."

The term " willful " does not imply the existence of actual malice or evil design. Thus in *Boyce* v. *Greeley Square Hotel Co.* (228 N. Y. 106) the Court of Appeals said per COLLIN, J. (at p. 111): "A willful injury means intentionally doing the act which is calculated or adapted to cause the injury, with design to inflict injury or *with disregard of the natural consequences of the act. The willful injury is in law malicious, although no malevolent purpose to cause it nor any motive of spite is imputed.* ' Whatever is done willfully and purposely, if it be at the same time wrong and unlawful, and that known to the party, is in legal contemplation malicious.' (*Wills* v. *Noyes*, 12 Pick. 324.) " (Italics mine.)

In *May* v. *New York Motion Picture Corp.* (45 Cal. App. 396) the court declared that a " willful " disobedience was an intentional

* 172 N. Y. 519.     * 250 Fed. 321.

disobedience and did not " necessarily imply any evil intent on the part of the servant or malice toward his master. *In civil cases, the word ' willful,' as ordinarily used in courts of law, does not necessarily imply anything blamable, or any malice or wrong toward the other party, or perverseness or moral delinquency, but merely that the thing done or omitted to be done was done or omitted intentionally. It amounts to nothing more than this: that the person knows what he is doing, intends to do what he is doing, and is a free agent.* (Benkert v. Benkert, 32 Cal. 470; Towle v. Matheus, 130 Cal. 577 [62 Pac. 1064]; 40 Cyc. 944.) " (Italics mine.)

In *Roseville Trust Co.* v. *American Surety Co.* (91 N. J. Law, 588) the court said (at p. 591): " By the term ' willfully ' is meant purposely or designedly. The intent to injure and defraud, which is necessary to constitute a willful misapplication, does not necessarily involve any malice or ill-will, but merely that general intent to injure and defraud which always arises in contemplation of law, when one willfully or intentionally does that which is illegal and fraudulent, and which, in its necessary and natural consequences must injure another. (*Agnew* v. *United States*, 165 U. S. 36; *Walsh* v. *United States*, 174 Fed. Rep. 615; *Pearce* v. *United States*, 192 Id. 561.) "

In the recent case of *Thompson* v. *Hays* (11 F. [2d] 244) the court had before it for construction a clause exempting a trustee from liability for anything but " his own willful default." The court said (at p. 248): " What is ' willful default,' as the term is used in the instrument of May 1, 1914? It means more than involuntary, inadvertent, negligent, mistaken, careless, or accidental default. It means an intentional designing failure to do or not to do something required — an affirmative wrong. *Van Siclen* v. *Bartol et al.* (C. C.) 95 F. 793; *In re Mallon's Estate*, 89 N. Y. S. 554, 43 Misc. Rep. 569; *Winslow Warren and Others, Trustees,* v. *Elizabeth B. Pazolt and Others*, 89 N. E. 381, 203 Mass. 328. In *Van Siclen* v. *Bartol et al., supra,* the Court refers to willful misfeasance as ' a conscious, deliberate breach of trust.' *In re Mallon's Estate,* 89 N. Y. S. 554; 43 Misc. Rep. 569, where a trustee had been relieved from liability except for willful default, the court said: ' The words " willful default " imply more than negligence or carelessness. The word " willful " means intentional, while the word " default " means transgression.' * * * *It is doubtless true that a trustee may be guilty of such wanton or willful neglect of his duties, such reckless indifference to and disregard of the interests and rights of the beneficiary, that the law will hold him guilty of a ' willful default.'* Henry L. Doherty & Co. v. Rice et al. (C. C.) 186 F. 204; Kessler & Co. et al. v. Ensley Co. et al. (C. C.), 129 F. 397." (Italics mine.)

We come now to the 2d paragraph of article XVI which stated that " In case at any time it shall be necessary and proper for the Trustee to make any investigation respecting any facts *preparatory to taking or not taking any action, or doing or not doing anything as such Trustee,* the certificate of the Company under its corporate seal, attested by the signature of its President and the affidavit of one or more Directors, shall be conclusive evidence of such fact to protect the Trustee in any action that it may take by reason of the supposed existence of such fact." (Italics mine.)

It seems to me that this paragraph, like the one immediately preceding it, had reference only to such acts or actions of the trustee as were expressly provided for in the indenture and not to voluntary acts of the trustee, as to which the instrument was wholly silent, such as the execution of a formal satisfaction or the authentication of duplicate bonds. It was not *" necessary* and proper " (in view of the provision for automatic satisfaction) for the trustee to take the action it did, and *a fortiori* it was not " necessary and proper " for it to make an investigation as a basis for that action.

Moreover, it is difficult to believe that the provision under discussion could have been intended to permit the trustee to *satisfy the indenture* solely on the basis of the mortgagor's statement that all outstanding bonds had been paid. An interpretation to that effect would practically nullify the indenture by destroying the only real reason for its existence. The court should not be astute to extend and enlarge the natural meaning of the language used by adopting a construction so opposed to the very essence of the trust instrument, so fraught with danger to the bondholders. Indeed, one cannot but entertain grave doubt that even an express permission to satisfy on the mortgagor's statement would be given effect, for reasons similar to those advanced in connection with. the " willful misconduct " clause.

There are yet other grounds for denying to the trustee the immunity claimed under the 2d paragraph of article XVI. In the first place, the evidence indicates that the certificate, affidavit and indemnity agreement were given for the purpose of inducing the trustee to issue a duplicate bond for $20,000 and not to procure the execution of a satisfaction piece. Strictly speaking, the trustee did not satisfy on the basis of these documents. It is fairly clear, however, that the issuance of the duplicate bond and the satisfaction of the indenture were part and parcel of one entire transaction consummated within a period of a very few days, and it strikes me, therefore, that liability should not be predicated on the narrow ground suggested. In the second place, the only document in evidence in this connection which bears the signature of the president of the mort-

gagor and which can, therefore, be regarded as complying with the provision of the indenture, is the mortgagor's letter to the trustee, dated February 27, 1924. This letter merely requested authentication of a duplicate bond " in the place and stead of lost bonds as per the enclosed resolution." Reference to the resolution of the directors reveals that among the recitals or " Whereas " clauses there is one stating that the twenty bonds in question " have not been sold " and " have been lost." Can this letter, even when read in connection with the resolution, be regarded as a proper certificate by the company, attested by its president, within the meaning of article XVI? I am not entirely satisfied that it can. But passing by this obstacle, we come to one much more serious, viz.: Was Cade's affidavit sufficient for the purposes of article XVI to permit the trustee to rely thereon as conclusive evidence that the twenty bonds belonged to the mortgagor and were lost? Although the evidence does not disclose that Cade was a director, counsel have since the trial conceded that he was. To comply with article XVI it was necessary for Cade to do more than allege that search for twenty bonds in the mortgagor's records and in the archives of the estate of H. H. Rogers had proved unavailing. If the bonds were in the hands of some one else, who had received them with the authority of the mortgagor, such a search would, of course, be futile. What did Cade say with regard to that possibility? He stated that he was *informed and believed* — no grounds or sources being given — that more than ten years earlier, before he became treasurer of the mortgagor, the bonds had been pledged as collateral for certain loans of *another* company, and that the loans had been paid. There is no averment, as such, that the bonds were returned to the mortgagor. They may have been retained by the lender or even by the borrowing company when the loan was repaid. It is true that early in the affidavit Cade stated that the mortgagor " is the owner of " the bonds and that they " are treasury bonds." But the very next sentence indicated that he was not speaking as of his own knowledge. He was only " informed " that the loan for which the bonds had been pledged had been repaid. It was a loan obtained not by the mortgagor but by the Atlantic Coast Electric *Railroad* Company. It might be — as far as Cade actually knew — that the loan had not been repaid at all, in which event the bonds would still be outstanding in the possession of the pledgee. Obviously the statement that the mortgagor owned the bonds and that they were treasury bonds was only Cade's conclusion from the unidentified and hearsay information that the loan had been repaid. The important question was whether the loan *had* actually been repaid and the bonds returned. An affidavit of Cade that he was

" informed " that this had been done, without disclosing the sources of his information, cannot, I take it, be regarded as a sufficient affidavit to justify the trustee's relying thereon as conclusive evidence that the mortgagor had received the return of the bonds and had lost them. It is perhaps not without significance that the very statement that Cade made upon information and belief proved, in fact, to be entirely untrue. As will appear later, nineteen of the bonds had been pledged for a loan to the Atlantic Coast Electric Railroad Company, which had *not* been repaid, and the twentieth bond had been issued by the mortgagor directly to the plaintiff for a valuable consideration, and could on no theory be regarded as belonging to the mortgagor. Even the statement that the latter had not paid any coupons on any of the twenty bonds since Cade became treasurer was incorrect to the trustee's knowledge, for its records show that paid coupons on the twentieth bond for the years 1915 to 1918, inclusive, had been cremated by it.

Nor can the trustee derive any benefit from the fact that prior to satisfying the indenture the twenty bonds had been replaced by a duplicate bond for $20,000, which it canceled as a precedent to the delivery of the satisfaction. Various statutes of our State authorize the issuance of duplicate stock certificates and negotiable instruments under specified circumstances. Section 178 of the Personal Property Law and sections 75 and 76 of the Stock Corporation Law authorize the *court* on proof satisfactory to *it* of the loss or destruction of original stock certificates to issue duplicates provided an indemnity bond be given *inuring to the benefit of any holder of the originals.* Section 333 of the Civil Practice Act authorizes parol evidence as to the contents of negotiable paper " upon the trial of an action " based on such paper where it appears that the original was lost, provided indemnity be given. These statutes are, of course, inapplicable here, and there are no others authorizing the issue of duplicate bonds for lost originals. Even in the absence of statute actions will lie to establish lost instruments or to compel the giving of duplicates. Ordinarily, in the case of non-negotiable instruments the delivery of duplicates will be directed without requiring an indemnity agreement. If thereafter it should appear that the instrument was in fact not lost but was actually in the possession of a person entitled to enforce it, it may perhaps be that the latter would be precluded by the adjudication from resorting to the obligor or to any one other than the plaintiff in the action, who received the proceeds of an instrument to which he was not entitled. But in all these contingencies, whether under statute or at common law, the essential prerequisite to the granting of relief is the obtaining of a court decree adjudging that

proof of loss or destruction, satisfactory to the court, had been furnished. Where, however, an obligor or a trustee under an indenture chooses to issue a duplicate instrument evidencing its obligation without the protection of a judicial decree, merely on proof satisfactory to *itself* that the original had been lost or destroyed, I know of no authority which would absolve it from liability to one otherwise entitled to enforce the original. This appears to be the situation here. There was no authority in law for the authentication of duplicate bonds by the trustee, and there was none to be found in the terms of the indenture. The very reasons which render article XVI inapplicable and ineffective in connection with the satisfaction of the indenture, including the inadequacy of Cade's affidavit, govern with equal force the delivery of a duplicate bond without either the production of the original or a court decree dispensing therewith. The insistence of the trustee upon the giving of an indemnity bond for its protection tends to confirm this view.

In this connection it is well to refer to the case of *Reynolds* v. *Title Guarantee & Trust Co.* (240 N. Y. 257) where the Court of Appeals declared, in an opinion written by LEHMAN, J., that even in the case of non-negotiable bonds a trustee authenticates duplicates at the risk of later being held liable to one possessing the originals and entitled to enforce them. In that case the bonds were registered and the trustee relied on the affidavit of the last registered holder that his bonds were lost or destroyed. The fact was, however, that the latter had pledged the bonds as collateral with a broker. The trustee, in ignorance of the falsity of the affidavit, issued duplicate bonds. The court said (at p. 263): " This right [the right of the indorsee of the lawfully registered holder] was not, in our opinion, lost by the subsequent issue of the duplicate bonds and the transfer of such duplicate bonds on the corporate books to another registered holder. * * * If the mortgagor or trustee may destroy the right of the owner of the original bonds to compel registry of the transfer by a previous transfer on its books even though made in good faith but without production of the bonds, the bonds lose that valuable element of facility of circulation created by their form; for a purchaser could not in that event accept delivery of bonds with safety unless he first inquired whether the bonds, even though outstanding, had not been transferred on the corporate books. Though the defendant relied on the affidavit of Powell that the bonds of which he was the registered holder were lost or destroyed, it must have known that if that affidavit were in fact false and the holder had actually parted with the bonds, any act which deprived the new owner of his rights, be they legal or equitable, complete or incomplete, to the bonds would be a wrong to him."

The court held that the holder of the duplicate bond who knew his bond was a duplicate, was not entitled to a *pro rata* share of the moneys received by the trustee for distribution to bondholders. So here the mortgagor could not affect the rights of the plaintiff by obtaining the issuance of a duplicate bond.

An interesting illustration of the attitude of our courts towards the issuance of duplicate bonds without the production of the originals may be found in the case of *Switzerland G. Ins. Co.* v. *N. Y. C. & H. R. R. R. Co.* (152 App. Div. 70), where the holder of coupon bonds mailed them to a Paris firm which never received them, the bonds never being heard of thereafter. The assignee of the holder sued the obligor, the New York Central Railroad Company, to compel it to deliver duplicate bonds. The trial court, on proof of the loss of the originals, directed the issuance of duplicates on condition that a proper indemnity agreement be given. The Appellate Division held, however, that the judgment was too favorable to the plaintiff because of the possibility that the bonds could be enforced by a *bona fide* holder, in which event the obligor would be liable both to him and to the holder of the duplicates. Accordingly the judgment was modified so as to direct the issuance of a certificate of indebtedness rather than a duplicate bond, said certificate to provide that if the lost bonds were later found in the hands of one entitled to enforce them, the certificate would to that extent become void.

It follows from the foregoing that the Guaranty Trust Company of New York must be held liable to the plaintiff to the extent that its wrongful conduct in satisfying the indenture damaged the plaintiff as the holder of bonds and coupons which were thus deprived of the security for their payment.

As was said in *Conover* v. *Guarantee Trust Co.* (88 N. J. Eq. 450, 459): "The ordinary measure of accountability is recompense to the *cestuis que trustent* for the loss sustained by reason of the breach of trust."

Defendants assert, however, that the bonds and coupons held by the plaintiff were issued without consideration and were, therefore, invalid. They contend accordingly that the plaintiff has no just grievance against the trustee.

As to bond 242, this claim is clearly without merit, for the evidence establishes beyond dispute that said bond was one of twenty-five issued in 1896 to the plaintiff and one O'Brien as compensation for their services in procuring certain contracts for the mortgagor. The same is true of the thirty-six unpaid coupons of said bond as well as the fourteen coupons detached from bonds 243–247, inclusive, the bonds themselves having been redeemed by the mortgagor.

The situation in regard to the other nineteen bonds is somewhat different.  They were pledged to the plaintiff as collateral security for a loan of $15,000 made by him, not to the mortgagor, the obligor on the bonds, but to the Atlantic Coast Electric *Railroad* Company, hereinafter termed the " railroad," which then owned all the stock of the mortgagor.  The loan is evidenced by a note in that amount, dated September 14, 1901, and maturing January 14, 1902, made by the railroad to the plaintiff's order and bearing interest at the rate of five per cent per annum.  Originally the loan was for $20,000, secured by twenty-six bonds of the mortgagor, but $5,000 was paid off during the year 1901 and seven bonds were accordingly released by the plaintiff.  The note of September 14, 1901, apparently represents a renewal of another in the same amount given on or about May 14, 1901.  The evidence reveals that the mortgagor had been in the practice of issuing bonds to be used by the railroad as collateral for loans obtained by the latter.  There is some dispute as to whether the mortgagor received consideration for the bonds thus intrusted to the railroad.  Counsel for the plaintiff claim that the mortgagor's account on the railroad books was credited with the face value of the bonds received, and they argue that inasmuch as balances taken at various times thereafter show the railroad as owing nothing to the mortgagor, the latter must have received the returned bonds or their equivalent.  No satisfactory . oral testimony was offered on this issue by either side, and it is difficult to determine it merely upon inferences to be drawn from incomplete books of account.  In the view I take of the case it is, however, unnecessary to decide this question because, even if it be assumed that the mortgagor did not receive consideration for the bonds held by the plaintiff, they are nevertheless enforcible at this time.  The railroad, it should be remembered, owned all the stock of the mortgagor and there were, therefore, no stockholders of the latter in a position to complain of the railroad's pledging the bonds for its own purposes.  Thus in *Martin* v. *Niagara Falls Paper Mfg. Co* (122 N. Y. 165) the execution by a corporation of negotiable paper for the accommodation of another was held capable of ratification by the stockholders where no rights of creditors or others were affected. The court said (at p. 172): "Assuming, for the purpose of disposing of this branch of the case, that the original notes had all been made * * * for the. accommodation of Woodruff, still it was entirely competent for the stockholders of the corporation, no rights of creditors intervening, and no fraud being claimed, to ratify the acts of Woodruff and bind the corporation for the payment of the debt."

In the instant case there was more than ratification, *for the bonds were pledged by the sole stockholder for its own benefit.* As to creditors, suffice it to point out that there is no evidence that there are any unpaid creditors of the mortgagor now in existence except the plaintiff. Apparently the redemption of the rest of the bond issue accomplished that. Defendants make much of a contract entered into by the plaintiff in April, 1896, with one Smock and others for a valuable consideration, by the terms of which the plaintiff agreed that a certain amount of unissued bonds of the mortgagor, included in which were the nineteen now held by the plaintiff, would be retained in the mortgagor's treasury and used only for betterments and the acquisition of additional plants. But this agreement no longer possesses vitality. At the time it was made, Smock and the other bondholders who were parties thereto desired protection against the possibility of depreciation of their bonds through the issuance of additional bonds without adequate consideration. Their bonds have, however, been redeemed and they are now without standing to enforce the agreement. For that matter, it is difficult to comprehend upon what theory the *mortgagor* can avail itself of the provisions of the Smock contract. It was not a party thereto, nor was the agreement made for its benefit. As to the defendant Eastern New Jersey Power Company, it is in no better position than its predecessor, the Atlantic Coast Electric Light Company, whose property it took over and whose liabilities it assumed with knowledge, actual or constructive, of the fact that the bonds were outstanding. Moreover, a receipt for the nineteen bonds, signed by the plaintiff, and other memoranda showing that the plaintiff held said bonds, were among the mortgagor's records. It may even be that the price paid for the mortgagor's property reflected an allowance for the twenty bonds held by the plaintiff. As there appears to be no one in existence who is in a position to urge the invalidity of the bonds and as no public interest appears to be involved, I am constrained to conclude that the nineteen bonds pledged with the plaintiff are free from attack on the ground of lack of consideration to the mortgagor.

We come now to the question of the Statute of Limitations. The $15,000 note in plaintiff's possession is concededly outlawed. He was nevertheless entitled to resort to the nineteen bonds and their coupons, which were pledged with him as collateral security for the loan. As was pointed out in *Hulbert* v. *Clark* (128 N. Y. 295), the Statute of Limitations extinguishes the remedy and not the right. It " does not after the prescribed period destroy, discharge or pay the debt " or produce a presumption of payment. It simply stands in the way of a creditor seeking to compel payment. A

lien on property, real or personal, given as security for a debt, is not impaired by the fact that the remedy at law for the recovery of the debt is barred by statute. It was accordingly held in that case that an action to foreclose a mortgage on outlawed notes was not barred by the statute. (To the same effect see 37 C. J. 700; Jones Collateral Securities [3d ed.], § 581; *House* v. *Carr*, 185 N. Y. 453; *Brooklyn Bank* v. *Barnaby*, 197 id. 210, 226.) Moreover, it is well settled that the pledgor cannot recover possession of the pledged property without paying the debt though an action thereon be barred by the Statute of Limitations. (37 C. J. 701; Jones Collateral Securities [3d ed.], § 582; *House* v. *Carr, supra.*) In the case last cited the Court of Appeals held that a court of equity would not, on the ground that the Statute of Limitations had run against a mortgage, restrain, as a cloud on title, a threatened sale under a power of sale contained in the mortgage, in the absence of a finding that the bond and mortgage had been paid. In other words, the debtor cannot come into equity to recover pledged security without doing equity by paying the debt.

The present action is not brought against the railroad to recover on the note which it drew to the plaintiff's order. As to the nineteen bonds and their coupons, plaintiff is suing the trustee for destroying the security behind them and thus, in effect, depriving him of the bonds and coupons themselves, or at least rendering their value questionable. The misconduct of the trustee did not occur until 1924 and no claim can properly be made that the remedy against the latter is outlawed. The twentieth bond is held by plaintiff as absolute owner and is obviously not barred by the statute since the bonds were not to mature until 1945 and were not called for redemption until 1924.

Defendants in their brief contend that the twenty-year Statute of Limitations bars all *coupons* not presented within that period, citing *Kelly* v. *Forty-second Street Railway Co.* (37 App. Div. 500). They fail, however, to perceive that the plaintiff is not seeking to recover on the coupons. The trustee held the property covered by the indenture as security for the payment of all the bonds and coupons issued thereunder. The fact that some of the coupons might be outlawed by the Statute of Limitations did not forfeit the right of the coupon holders acting through the trustee to retain the mortgaged property until all bonds and coupons, whether barred or not, had been paid. The mortgagor was not entitled to obtain a satisfaction of the trust deed while *any* bonds or coupons remained unpaid. As previously pointed out, the indenture expressly provided that "holders of overdue coupons, shall, for all purposes under this indenture, be deemed holders of bonds to the same amount."

I see no escape from the conclusion that the Statute of Limitations is no defense to the present action which seeks no recovery either on the note or on the bonds and coupons.

Before leaving the question of the Statute of Limitations it may not be amiss to mention again the provision of article II of the indenture, previously quoted, prohibiting any one but the trustee from suing for principal or interest on any bond. The bonds themselves expressly stated that they were issued and held subject to the terms and conditions of the indenture. This seems to be more than a mere reference to the security such as the statement contained in the bonds involved in the recent case of *Enoch* v. *Brandon* (249 N. Y. 263). (See *Old Colony Trust Co.* v. *Stumpel*, 247 N. Y. 538.) There is, therefore, serious doubt in my mind that the statute ever commenced to run against the coupons themselves which, when past due, were stated in the mortgage to be equivalent to bonds for the same amount. (See *McClelland* v. *Norfolk Southern R. R. Co.*, 110 N. Y. 469.) The plaintiff's cause of action on the coupons could not be barred if the right to sue for relief had never accrued. (Civ. Prac. Act, § 11.)

There still remains the defense that there is a presumption that the $15,000 note was paid, more than twenty years having elapsed since its maturity. The presumption of payment at the expiration of twenty years is conceded by defendants to be one of fact and not of law, and, as such, open to rebuttal. (*People* v. *Freeman*, 110 App. Div. 605, 608; *Hall* v. *Roberts*, 63 Hun, 473; 30 Cyc. 1277.) It may be overcome by proof that the debtor was in no condition to pay, or by evidence of other circumstances rendering it improbable that the obligation had in fact been met. (30 Cyc. 1280.) I am of opinion that in the instant case the presumption of payment has been successfully rebutted. The railroad went into the hands of a receiver in 1902 and its property was disposed of under a foreclosure sale not later than the year 1905. Its liabilities were not assumed by the Atlantic Coast Electric *Railway* Company, the purchaser at the sale. After 1905 the maker of the note really ceased to exist. Furthermore, not merely the note itself, with a certificate showing its dishonor at maturity, but even the *collateral* pledged to secure its payment are still in the possession of plaintiff. It is extremely unlikely in the light of these facts that the note was paid. To the extent that the defense of payment is based upon a presumption it cannot be sustained.

Some attempt has been made to establish that the note was *actually* paid, but the evidence satisfies me to the contrary. The failure of the plaintiff to present coupons on the nineteen bonds

may have been the result of inadvertence and/or his absence in England for a considerable period. It is more probable that it was due to his reluctance, while he was an important figure in public life, to risk the possibility that unpleasant litigation and consequent unfavorable publicity might ensue if the coupons were not honored and an action commenced by the mortgagor to cancel the bonds as invalid. A similar suit had been brought in 1902 against the plaintiff and others by Smock, but it had never gone to trial. Why, we are not informed. It may be significant in this connection that the estate of H. H. Rogers which had held bonds of the mortgagor totaling $234,000 *received under circumstances similar to those attending the pledge of the nineteen to the plaintiff*, had also refrained from presenting coupons on those bonds for a like period of time. Apparently here too disinclination to take the chance of stirring up litigation was responsible. Moreover, it should be noted that even the coupons from bond 242, which was not part of the collateral for the loan, had not been presented by the plaintiff from 1902 to 1924 except those due in the years 1915 to 1918, inclusive. These circumstances tend to confirm the conclusion that it was not because the note had been paid that the coupons were not presented.

As to the claim of laches: The bonds did not mature until 1945 and were not called until 1924, so that no delay with regard to the *bonds* can be charged to the plaintiff. The maker of the note went into the hands of a receiver shortly after its maturity date and its existence was terminated within a few years thereafter. Under these circumstances the plaintiff's failure to sue on the *note* cannot be urged to establish laches. It is at most with regard to plaintiff's failure to present *coupons* that the plaintiff may be said to have been dilatory. Even as to these the claim of laches can at most affect those coupons, negligible in amount, which matured more than twenty years prior to the commencement of the action. It seems to me, however, that the defense of laches cannot prevail even as to them. It has not been established that any injury resulted from the delay in presenting coupons. The testimony indicated, as previously observed, that the mortgagor had in its possession a receipt signed by the plaintiff acknowledging his possession of the nineteen bonds, and various other records of the mortgagor also showed that the plaintiff held these bonds. Under the circumstances the mortgagor and its successor, Eastern New Jersey Power Company, were chargeable with knowledge of that fact. As to the latter it may well be, as far as the record shows, that the purchase price paid for the mortgagor's properties was computed on a basis which recognized the validity of the bonds held by plaintiff.

Nor is the *trustee* in a position to defeat the action on the ground of laches. It appreciated the possibility that the bonds and coupons were outstanding and attempted to guard itself against that very contingency by obtaining an indemnity agreement. It chose not to risk liability without an agreement to save it harmless. It cannot be prejudiced. It knew that coupons on bond 242 had been presented and paid in 1915 to 1918, inclusive. Mere delay without injury is insufficient to constitute laches. (*Hoffman Brewing Co.* v. *Wuttge,* 200 App. Div. 357; revd., on other grounds, 234 N. Y. 469.) (See *Collins* v. *Burr,* 209 App. Div. 116, 120.) Indeed, in *Cox* v. *Stokes* (156 N. Y. 491, 511) the Court of Appeals declared that it was open to serious doubt whether the doctrine of laches as distinguished from the Statute of Limitations exists in this State. (See, also, *Galway* v. *M. E. R. Co.,* 128 N. Y. 132.) Cases such as *Groesbeck* v. *Morgan* (206 N. Y. 385) are distinguishable. In the *Groesbeck* case the court held that a suit for specific performance was barred on the ground of laches. The court's reasoning, however, was that specific performance was not a legal right but a discretionary remedy and that plaintiff's unreasonable delay restricted him to a law action for damages. In the instant case plaintiff has no legal remedy against the trustee which it can enforce if the equitable remedy is refused.

It follows that the plaintiff is entitled to judgment against the Guaranty Trust Company of New York. On bond 242 he may recover the redemption value, $1,050, with interest at the rate of six per cent per annum from November 14, 1924, interest ceasing under the terms of the indenture on June 1, 1924, but commencing to run from November 14, 1924, the date payment of the bond was refused. On the thirty-six coupons from bond 242, he may recover $900, with interest at six per cent per annum from February 6, 1925, the date they were presented and not honored. On the fourteen coupons from bonds 243 to 247, inclusive, he is entitled to $350, with interest at six per cent per annum from February 6, 1925. In addition, the plaintiff is entitled to recover the amount of the nineteen bonds, at $1,050 each, and the coupons pertaining thereto, but in no event more than the principal of the note with interest to date. The note amounts to $15,000. Interest is to be computed at the rate of five per cent per annum from September 14, 1901, to January 14, 1902, its maturity date, and at six per cent per annum from January 14, 1902. The redemption value of the nineteen bonds, with interest thereon from November 14, 1924, together with the total of the unpaid coupons relating to the nineteen bonds, with interest thereon from February 6, 1925, is in excess of the

principal and interest due on the note and plaintiff's recovery as to the nineteen bonds and the coupons will, therefore, be limited to the amount of the principal and interest due on the note.

The defendant Coast Cities Railway Company intervened as such voluntarily. Its only connection with this controversy is that its predecessor, the Atlantic Coast Electric *Railway* Company, purchased the properties of the railroad at the foreclosure sale. Since none of the latter's liabilities were assumed, said defendant is really not an interested party in this litigation. The remaining defendant, Eastern New Jersey Power Company, although it assumed the obligations of its predecessor, the mortgagor, cannot be held liable in this action since the suit was brought only against the trustee, on the theory that the latter committed a breach of trust. No recovery was or is sought on the bonds or coupons, and indeed, the power company became a party defendant on its own motion. The complaint should be dismissed against both Eastern New Jersey Power Company and Coast Cities Railway Company, without costs.

The plaintiff's motion to strike out defendant's Exhibit " Z " is denied, with exception to the plaintiff, as are his motions to strike out the testimony and evidence with regard to the railroad's books of account, with similar exceptions. (Civ. Prac. Act, § 374- a.) The motion to dismiss made by the Guaranty Trust Company of New York is denied, with exception to it. The motions to dismiss made by the other defendants are granted, with exceptions to the plaintiff. Submit findings on notice.