MARSHALL & ILSLEY BANK, Trustee, Plaintiff and Respondent, vs. GUARANTY INVESTMENT COMPANY and others, Defendants: GROSSMAN, Trustee in Bankruptcy, Appellant.

*September 13, 1933—January 9, 1934.*

For the appellant Grossman, trustee in bankruptcy, there were briefs by *Bender, Trump, McIntyre & Freeman,* attorneys, and *Eugene L. McIntyre* and *Ronold A. Drechsler* of counsel, all of Milwaukee, and oral argument by *Mr. McIntyre* and *Mr. Drechsler*.

*Henry E. Foelske,* attorney, and *Eugene Wengert* of counsel, both of Milwaukee, for the respondent.

The following opinion was filed November 7, 1933:

WICKHEM, J.   The question involved in this case is whether the trustee under a trust deed to secure a bond issue, who by the trust deed has the right, but not the obligation, to advance money to repair defaults by the mortgagor, and to whom is reserved a lien for such advances prior to the lien of the trust deed, has so acted with respect to the discharge of his obligations as trustee as to disentitle him to the advantage stipulated for in the trust deed. A consideration of this contention requires a somewhat detailed statement of the facts.

The mortgagor was organized May 25, 1926, and on June 14, 1926, acquired by assignment a ninety-nine-year lease upon the premises in question. The stockholders of the mortgagor at the time were Messrs. Maischoss, Douglas, and Tank. Maischoss owned 1,200 shares of the 2,000 shares of common stock. About two years later Max L. Thiermann, president of the firm of Hackett, Hoff & Thiermann, Inc., and Walter Oeflein, purchased the Maischoss stock, each of the purchasers getting 600 shares. Thiermann subsequently acquired another 200 shares, five of which were in the name of Walter F. Kemke, vice-president of the firm of Hackett, Hoff & Thiermann, who, in 1928, became vice-president of the mortgagor. The Hackett firm was a corporation engaged in the management of business properties and the financing and underwriting of bond issues. It took over the management of the building here involved in July, 1927.

On June 1, 1926, the mortgagor executed a trust deed to Hackett, Hoff & Thiermann, Inc., as trustee, to secure a bond issue in the sum of $350,000, the security being the leasehold heretofore referred to and an office building which was to be erected with the proceeds of the bond issue. On

the same date the mortgagor executed to the Hackett Company a second trust deed or mortgage for $75,000 upon the same security. The first trust deed contained the usual requirements that the mortgagor pay ground rent, taxes, interest on coupons and bonds as they matured, and carry certain required insurance. It was provided that in case of default the trustee should have the power, upon written notice, to declare the entire principal sum due. Another provision gave the trustee the power, but did not impose upon it the duty, to advance money to repair defaults accruing or existing as to provisions or conditions of the trust deed, or to prevent defaults, "if in its discretion and judgment it is advisable so to do." For such advances with interest at the rate of ten per cent. per annum the trustee was specifically given a first lien on the leasehold prior to the lien of the trust deed. It was provided that such advances to repair defaults would not be considered a waiver of the default so far as the trustee or bondholders were concerned. It was provided that the trustee had "full and plenary discretion," in connection with all of the matters heretofore mentioned, and should not be liable for errors of judgment, or for the neglect, omission, or wrongdoing of any agent, if it exercised reasonable care in selecting an agent, nor for the exercise or failure to exercise any discretion or power hereunder, or for mistake or error in judgment, or be otherwise answerable except for its own neglect or default. It was further provided that the trustee should not incur any liability for not exercising, on its own motion, any right, or for failure to keep itself informed of any default on the part of the mortgagor, unless "it shall have received written notice thereof from the holders of not less than twenty per cent. in amount of the then outstanding bonds."

Although the mortgagor had a business office in the Guaranty Building, its active office was in the offices of Hackett, Hoff & Thiermann, Inc. The mortgagor maintained its own

bank account, into which were deposited all of its current income and out of which were paid with checks of the mortgagor the expenses of operating the building. From the balances on hand in this bank account, the mortgagor from time to time paid over various sums to the Hackett company by check of the mortgagor. The building was ready for occupancy about July, 1927, and from that time the Hackett company managed the building. The last date upon which the mortgagor had a credit balance in the account of the Hackett company was July 2, 1927. From that time on, to the last entry on May 5, 1931, the mortgagor was overdrawn in various amounts, and on the last date the amount of the overdraft was $56,628.14. It thus appears that during the entire period of the building's completion and occupancy, its income was not sufficient to meet the obligations of the trust deed.

It is difficult to present, within a reasonable compass, the transactions here involved, but it is necessary to show in some detail the manner in which the trustee dealt with this property. The Hackett company did not keep separate the moneys which it received from the mortgagor. These funds were placed in its general bank account, and the Hackett company made all disbursements by ordinary firm checks. When a check was drawn to pay an obligation of the mortgagor, it was charged to the mortgagor's account with the Hackett company. The checks contained nothing to indicate that they were drawn upon a trust account, nor were there any notations on the face of the checks indicating that they were used for the account and transactions of the mortgagor. The Hackett company paid out money on behalf of the mortgagor for various purposes, regardless of the fact that the latter had no balance to its credit. When payments were made by the mortgagors to the Hackett company, they were general payments on account without any direction to apply them towards the payment of any particular class of items,

and they were simply entered on the books of the Hackett company as credits to the mortgagor. In this account between the Hackett company and the mortgagor, the first entry is made on June 15, 1926, for a corporate minute book. The last entry was on May 5, 1931. The account shows debits for practically every variety of expenditure ordinarily involved in the organization of a corporation, the erection of the building, and the execution of the mortgagor's duties under the trust deed. The claims for reimbursement which are here involved are as follows:

| Date of Payment. | Description. | Amount. |
| --- | --- | --- |
| January 3, 1931. | County and state taxes for 1929..... | $6,017 87 |
| January 4, 1930. | City taxes for 1928................ | 25,579 70 |
| August 2, 1930. | Ground rent, third quarter......... | 7,500 00 |
| May 10, 1930. | Ground rent, second quarter........ | 7,500 00 |
| March 4, 1930. | Ground rent, first quarter.......... | 7,500 00 |
| November 5, 1929. | Ground rent, fourth quarter........ | 7,500 00 |
| | | $61,597 57 |
| | Credit payment on account......... | 4,969 43 |
| | Balance due..................... | $56,628 14 |

The ground rent and the taxes were all paid long after they were due and in default. On June 8, 1931, the Hackett company was adjudged a bankrupt. On August 3, 1931, the defendant Grossman was appointed trustee in bankruptcy for the Hackett company. On August 10, 1931, the Hackett company resigned as trustee for the mortgagor, and on October 16, 1931, plaintiff was appointed as trustee, and because of defaults of the mortgagor gave notice of an option to declare the entire amount due.

The findings of the trial court that are of importance here, and to which exception is taken by the defendant, are in substance as follows: that if it wished to be protected, the trustee owed a duty to be frank with the bondholders, to apprise them of defaults by the mortgagor, and of the fact that it would claim a prior lien for advances to repair defaults; that the Hackett company failed to apprise the bond-

holders of defaults by the mortgagor, or to inform them of the true situation to enable them to take steps to protect themselves; that the connection with the mortgagor of Max L. Thiermann was not disclosed to the bondholders, and that the said Thiermann was so vitally interested in the protection of the mortgagor that there was a conflict of interest between the trustee and the bondholders; that the continual advancement of moneys to the mortgagor to prevent and repair defaults had the effect of lulling into security the bondholders and leading them to suppose that the enterprise was in fact meeting its obligations, and kept them from taking the proper steps to protect themselves. As conclusions of law the court found that the Hackett company abused its discretion and violated its duty in the respects found; that it was inequitable for the Hackett company to continue to act as trustee due to the circumstances and the conflicting interest and obligations of its officers; that its conduct constituted an actual fraud upon the bondholders, and that the Hackett company under the circumstances cannot equitably claim a prior lien in a court of equity, because it does not come into court with clean hands; that under the doctrine of equitable estoppel appellant is precluded from asserting its rights to a priority.

Upon the facts presented, the questions arise whether the Hackett company, as trustee, breached its trust or abused its discretion, and if it did, whether it thereby forfeited its stipulated right to a priority for advances claimed to have been made to repair defaults. This requires some consideration of the character and scope of the duties of such a trustee. It is frankly recognized that the law governing the relationships involved in a trusteeship to secure a bond issue have not been extensively or satisfactorily developed by the courts. As was pointed out by Mr. Louis S. Posner in 42 Harvard Law Review, 198, 199, "In view of the present importance of the subject, it is noteworthy that there should have been so little written upon it in the fifty years during which this field of the law has been developing. Indeed, the compara-

tively few cases which deal with the subject leave many of its problems altogether untouched." As was pointed out by Mr. Posner, such a trustee would seem to occupy middle ground between a mere stakeholder or depositary, on the one hand, and a testamentary trustee, on the other. The duties of the stakeholder are almost entirely the result of the contract creating the relationship, while in the case of the testamentary trustee the law imposes or implies extensive duties which may not be modified or affected by stipulations of the contract. See, also, 33 Columbia Law Review, 97. Certainly it would seem to be true that the trustee under a trust deed to secure a bond issue is not to be held to have assumed as onerous an obligation as does the testamentary trustee. It would seem equally true that it is a mistake and an understatement of its responsibilities to treat it as a mere depositary or stakeholder. That the attempt accurately to set out the limits of the corporate trustee's obligations is difficult, goes without saying. The courts have an obligation to keep pace with the business world, and the imposition of duties and obligations upon a trustee that are more severe than called for will lead to difficulty in securing trustees who will accept the responsibility, and may even destroy the utility of the trust deed as an investment device. On the other hand, it is obvious that any rule that permits such a trustee to deal entirely at arm's length with the bondholders and mortgagor must inevitably lead to the discrediting of the device and its ultimate abandonment.

At this point it may be noted that not only in this case but in many other cases, the trustee is not an impartial person interested merely in his compensation or fee, but an actual promoter of the enterprise whose property forms the security for the bond issue. It would be intolerable to limit such a trustee merely to the obligation imposed by the terms of the contract made and drafted by it, and rarely even seen by the bondholders. It is our conclusion that the trustee

under a bond issue does owe to the bondholders certain duties independently of the terms of the trust deed, and that these duties will be imposed regardless of any exculpatory provisions in the trust deed. Such a trustee has an obligation to exercise good faith as well as ordinary vigilance and intelligence in protecting the interests of the bondholders.

"In accepting the trust and becoming a mortgagee in trust for the benefit of the bondholders, the defendant undoubtedly undertook to discharge the duty and exercise the care and diligence which would naturally be expected of an intelligent person acting in like circumstances to protect his own mortgage." *Patterson v. Guardian Trust Co.* 144 App. Div. 863, 129 N. Y. Supp. 807.

"The delicate position in which a trustee, therefore, is placed by the trust deed, in and by which he is required and obligated to act in a dual capacity, also becomes clear, and in the execution of his obligations and powers under the law it is incumbent upon him to use the utmost good faith towards all parties in interest." *Schroeder v. Arcade Theater Co.* 175 Wis. 79, 184 N. W. 542.

See, also, *Harvey v. Guaranty Trust Co.* 134 Misc. 417, 236 N. Y. Supp. 37; *Rhinelander v. Farmers' Loan & Trust Co.* 172 N. Y. 519, 65 N. E. 499; *Browning v. Fidelity Trust Co.* 250 Fed. 321; *First National Fire Ins. Co. v. Salisbury,* 130 Mass. 303.

If the trustee is interested in the mortgagor, whether as a promoter or stockholder, there will inevitably be some conflict of interest with the bondholders, and within limits this interest may perhaps be served. Recognition of this is attempted to be made in trust deeds giving the trustee the right, as did this one, to repair defaults or to prevent them by the use of its own funds, and then to claim a lien superior to that of the bondholders. It may be contended that the trustee may act under such a clause with a view solely to serving his own interests as contrasted with those of the bondholders. However, we think such a construction can-

not be sustained, and if it were to be, that the clause would be ineffective to modify the duties cast by law upon the trustee. If a corporation having interests adverse to the bondholders is to be permitted to act as trustee, it should have imposed upon it the same obligations as are assumed by an impartial trustee. Such a trustee must lay aside its adverse interest and must exercise its discretion and act for the benefit of the bondholders impartially and in good faith. It will not be permitted to exercise the options and discretion given to it by the trust deed for its own benefit and without regard to the interests of the bondholders.

Applied to the present case, the Hackett company had no right to consider merely its own interest in the mortgagor, or in the success of the issue, or in its professional reputation as a promoter of such issues, to the exclusion of the interests of the bondholders. In determining the wisdom of making advances to repair or prevent defaults, it was obligated to exercise an impartial, intelligent judgment on behalf of the bondholders. The trust deed contains provisions that advances by the trustee shall not waive its right as trustee to declare a default and to declare the whole sum of the bond issue presently due and payable as the result of such default. The bondholders are entitled to have this clause administered by the trustee in their behalf with the care and diligence "which would naturally be expected of an intelligent person acting in like circumstances to protect his own mortgage."

The trust deed further provided that the trustee was excused for failure to discover or act upon defaults unless notified by a certain percentage of the bondholders. This would imply that at some point in the course of this transaction it became the duty of the trustee to consider whether it should not give notice of these defaults to the bondholders in order that they might act for their own protection. However, it is probably not necessary to resort to the implica-

tions of this clause in order to arrive at a proper conclusion in this case. The trustee under this trust deed had the right to prevent or to repair defaults and to claim a lien superior to that of the bondholders for moneys advanced for these purposes. It was thus within the power of a trustee, with interests adverse to the bondholders, to impair and ultimately to displace their security by the lien of his advances.

In view of the heretofore stated duty of such a trustee to lay aside his self-interest sufficiently to act intelligently and fairly in the interests of the bondholders, we think it must be held that the trustee, without violating this duty, could not continue indefinitely to prevent or repair defaults without apprising the bondholders of the situation by notice. In all cases where it makes advances, the lien of which is stipulated in the trust deed to be superior to that of the bondholders, the trustee, if it intends later to claim the benefits of such a stipulation, must notify the bondholders within a reasonable time after such advances are made, that the defaults have been so prevented or so repaired. Such a course of action is necessary in order to discharge a duty which the law implies in order that the bondholders may know what is happening to their security, and consider and take such steps as they deem necessary for their protection. In case of failure to give such a notice, there can be no claim of priority. There is no evidence here that such a notice was ever given, and all the reasonable inferences support the conclusion of the trial court that it was not.

It is contended that there is no showing of damage to the *cestuis* arising out of this breach of trust. Assuming that this is necessary, it is clear enough that there will be damage to them if the recreant trustee be permitted to displace their security to the extent of the lien. It seems to us that any rule other than the one heretofore stated would open the way to unconscionable treatment of bondholders

by adversely interested promoters who assume to act as trustees.

In view of the conclusions herein stated, it is unnecessary to consider or to determine whether the trustee in other respects violated its duty to the bondholders.

*By the Court.*—Judgment affirmed.

FRITZ, J., dissents.

A motion for a rehearing was denied, with $25 costs, on January 9, 1934.